GRAIN MERCHANTS OF INDIANA, INC., et al., Bankrupts, Mark L. France, Trustee, Appellants,

v.

UNION BANK AND SAVINGS COMPANY, BELLEVUE, OHIO, Appellee.

No. 17120.

United States Court of Appeals
Seventh Circuit.

March 13, 1969.

**210**

George E. Fruechtenicht, Rothberg, Gallmeyer, Fruechtenicht & Logan, Fort Wayne, Ind., George M. Treister, Los Angeles, Cal., for appellants.

A. Bruce Schimberg, and H. Bruce Bernstein, Chicago, Ill., Eli S. Silberfeld, New York City, amicus curiae.

R. David Boyer, Paul W. Philips, Helmke, Philips & Beams, Fort Wayne, Ind., for Respondent-Appellee, Union Bank & Sav. Co., Bellevue, Ohio.

Loren M. Bobbitt, Rubin G. Cohn, Harold C. Havighurst, Richard G. Hershey, Albert E. Jenner, Jr., and Soia Mentschikoff, Illinois Com'rs on Uniform State Laws, Chicago, Ill., Amicus Curiae.

Before CASTLE, Chief Judge, and FAIRCHILD and CUMMINGS, Circuit Judges.

CUMMINGS, Circuit Judge.

In September 1965, Grain Merchants of Indiana, Inc. commenced its business of buying and selling grain and feed ingredients. On the 17th of that month, Grain Merchants entered into a security agreement with Union Bank and Savings Company of Bellevue, Ohio. Pursuant to Section 9–302 of the Uniform Commercial Code (5 Burns Ind.Stats.Ann., Title 19, § 19–9–302),[1] appropriate financing statements were filed in the office of the Indiana Secretary of State and of the Allen County, Indiana, Recorder that same month. The security agreement granted the Bank a security interest in all of Grain Merchants' accounts receivable "now or hereafter received by or belonging to Borrower [Grain Merchants] for goods sold by it or for services rendered by it." This security interest was to secure loans to be made by the Bank to Grain Merchants, but the loans were not to exceed 60 per cent of the total of said accounts receivable which were not more than 60 days old.

During the October 1965—September 1966 period that the Bank was lending working capital to Grain Merchants, on or about the 20th day of each month

---

1. For convenience sake, later references to the Uniform Commercial Code will not contain the Indiana statutory citations.

Grain Merchants submitted to the Bank a financial statement as of the end of the previous month, a list of all accounts receivable, and a promissory note in the sum of 60 per cent of the outstanding accounts receivable as of the last day of the previous month. As the proceeds of accounts receivable were collected by Grain Merchants, they were deposited in an account with the Bank, and, prior to October 3, 1966, Grain Merchants was permitted to draw on this account in order to satisfy its day-to-day expenses of doing business.

For the purposes of this case, three promissory notes executed by Grain Merchants in the Bank's favor are pertinent. Two notes in the amounts of $30,000 and $20,000 were executed in December 1965, and a $100,000 note was executed on September 20, 1966. Upon receipt of this last note, the Bank cancelled a note for a like amount which had been executed by Grain Merchants the previous month. All parties concede that the cancellation of this August note on September 20 constituted the last formal extension of new value to Grain Merchants.

On September 30, 1966, Grain Merchants, which had become insolvent in June of that year, ceased doing business. On October 27, 1966, it filed its petition in bankruptcy.

On October 3, the Bank took various steps to apply assets in the hands of Grain Merchants toward payment of the $152,255.55 balance, including interest, owed on these three notes. Out of an October 3 deposit by Grain Merchants with the Bank, $13,575.53 appropriated by the Bank represented collections on accounts receivable which came into existence after September 20, 1966. On October 3, Grain Merchants turned over to the Bank its then outstanding uncollected accounts receivable. The Bank then proceeded to collect these accounts, and $38,865.96 of these collections were on accounts receivable which arose after September 20, 1966.

In Grain Merchants' bankruptcy proceedings, the referee ordered the Bank to turn over to the bankruptcy trustee the aforesaid amounts totaling $52,441.-49, less $7,116.52, which represents an excess over the total indebtedness to the Bank and is in escrow. Therefore, the present proceeding involves $45,324.97.

The bankruptcy referee held that the transfer of accounts receivable to the Bank took place at the time that the individual accounts came into existence and that therefore the transfer of accounts receivable post September 20, 1966, were transfers on account of an antecedent debt. He concluded that the transfers of such accounts receivable constituted preferences within Section 60a of the Bankruptcy Act (11 U.S.C. § 96(a)). He also concluded that at the time of the transfers of such accounts the Bank had reasonable cause to believe that Grain Merchants was insolvent, so that the preferences were voidable under Section 60b of the Bankruptcy Act (11 U.S.C. § 96(b)). The district court set aside the referee's turnover order, holding that the transfers to the Bank of these accounts receivable did not constitute a preference. The facts are set out in more detail in Judge Eschbach's thorough opinion, reported at 286 F.Supp. 597 (N.D.Ind.1968).[2]

2. Battle lines were drawn and issue joined by commentators and practitioners long before the Bank ever conceived of making loans to Grain Merchants on the strength of accounts receivable whenever acquired. The result we reach today has been thoroughly anticipated by some and repudiated by others over the course of the last decade at least. It would serve little purpose to attempt to annotate the pros and cons of each argument advanced by the parties in the present case. The articles prior to In the Matter of Portland Newspaper Publishing Co. Inc., 271 F.Supp. 395 (D.Ore.1967), appeal docketed sub nom. Williams v. Rose City Development Co., No. 22507–A (9th Cir. May, 1968), are collected in Viles, "The Uniform Commercial Code v. The Bankruptcy Act," 55 Ky.L.Rev. 636 (1967). See generally 2 Gilmore, "Security Interests in Personal Property" § 45.6 (1965). Useful recent studies are cited at appropriate points herein.

*The Transfer Occurred a Year Before Bankruptcy.*

The Bankruptcy Act permits a bankruptcy trustee to avoid a "preference," as defined in the Act, if the creditor had reasonable cause to believe that the debtor was insolvent at the time of the transfer (Section 60b; 11 U.S.C. § 96 (b)). The referee found that the Bank had such cause, and the district court did not dispute this finding. The bankruptcy referee held that there was a "preference" on the ground that there had been a transfer of property of Grain Merchants to the Bank within four months before the filing of the bankruptcy petition, on account of an antecedent debt (Section 60a(1); 11 U.S.C. § 96(a) (1)).[3] In its contrary holding that there had been no such transfer, the district court relied on Section 60a(2) of the Bankruptcy Act providing that a transfer of property is deemed to have been made "when it became *so far perfected* that no subsequent lien upon such property obtainable by legal or equitable proceedings on a simple contract could become superior to the rights of the transferee" (11 U.S.C. § 96(a) (2); emphasis supplied). This is, in the first instance, a question of priorities between creditors rather than a question of complete perfection in the abstract. The district court concluded that Grain Merchants' transfer to the Bank of the security interest in the post September 20, 1966, accounts receivable was "so far perfected" when the financing statements were filed in September 1965 that it must be deemed to have been made then by virtue of Section 60a(2). Therefore, there was no transfer within four months of filing the bankruptcy petition and consequently no preference within Section 60a(1) of the Act.

The agreement between Grain Merchants and the Bank was executed on September 17, 1965, and granted the Bank "a security interest" in all of Grain Merchants' accounts receivable "now or hereafter received." The parties thus intended to accomplish a transfer to the Bank of a security interest in Grain Merchants' present and future accounts receivable. In conformity with Section 9–302 of the Commercial Code, appropriate financing statements were duly filed later that month.

Reference to state law is necessary to determine whether a secured creditor has "so far perfected" his lien as to cut off the rights of a subsequent lien creditor under Section 60a(2) of the Bankruptcy Act. McKenzie v. Irving Trust Co., 323 U.S. 365, 370, 65 S.Ct. 405, 89 L.Ed. 305; Matthews v. James Talcott, Inc., 345 F.2d 374 (7th Cir. 1965), certiorari denied, 382 U.S. 837, 86 S.Ct. 84, 15 L.Ed.2d 79. Since the Uniform Commercial Code was in effect in Indiana at the time of this transaction, this question must be answered by reference thereto. Section 9–204(3) of the Commercial Code validates a floating lien by providing that "a security agreement may [as here] provide that collateral, *whenever acquired,* shall secure all obligations covered by the security agreement" (emphasis supplied). This Section obviously permits a security agreement to create a lien in after-acquired accounts receivable.

Under Section 9–301(1) (d) of the Code, the Bank's unperfected security interest in the future accounts receivable would be subordinate to the rights of "a person [lien creditor] who is not a secured party and who is a transferee to the extent that he gives value without knowledge of the security interest and *before it is perfected*" (emphasis

---

3. Section 60a(1) defines a preference as follows:

"A preference is a transfer, as defined in this Act, of any of the property of a debtor to or for the benefit of a creditor for or on account of an antecedent debt, made or suffered by such debtor while insolvent and within four months before the filing by or against him of the petition initiating a proceeding under this Act, the effect of which transfer will be to enable such creditor to obtain a greater percentage of his debt than some other creditor of the same class."

supplied). A lien creditor is defined in Section 9–301(3) as "a creditor [including a bankruptcy trustee] who has acquired a lien on the property involved by attachment, levy or the like * * *." Thus we are presented with a situation where as soon as an account receivable comes into existence and is sought to be attached by a lien creditor, it has already become subject to a perfected security interest—here that of the Bank.[4] The very occurrence which gives rise to the full perfection of the security interest prevents the subsequent lien creditor from obtaining a priority as to the property. Although the Code does not explicitly resolve this problem, we are persuaded by virtue of Section 9–301(1) (d), taken in conjunction with Section 9–204(3), that a secured creditor who has duly filed a financing statement covering after-acquired collateral is entitled to priority over a subsequent lien creditor seeking to levy on the same property.[5] Thus by promptly filing the financing statements required by the Code, the Bank's security interest in the future accounts receivable then became superior to subsequent liens obtainable by "proceedings on a simple contract" as prescribed in Section 60a(2) of the Bankruptcy Act.

Our conclusion that this transfer occurred in September 1965 is consistent with the purposes of the Bankruptcy Act. A bankruptcy trustee is meant to take the assets subject to all liens conferred by state law, except where necessary to avoid preferences or fraudulent transfers. 2 U.S. Code Cong. Service,

81st Cong., 2d Sess. p. 1986 (1950). To implement the first exception, Section 60 of the Bankruptcy Act permits a trustee in bankruptcy to treat "preferences" as voidable. However, under the preference Section as it existed prior to 1938, a series of cases sustained transfers of security interests attacked as preferences so long as the agreement bound the debtor prior to the 4-month period, even though the interest was unrecorded or non-possessory until the creditor sought to perfect his right on the eve of bankruptcy. The tardy recordation or seizure of the collateral was said to "relate back" to the date of the original security agreement under state law as incorporated by reference in Section 60. See 286 F.Supp. at 603.

But the significance of these cases was not limited entirely to the evil of the secret lien. Even in cases where a security interest was duly recorded, if under state law taking possession of the collateral was required for perfection, as was the case for after-acquired accounts in so-called Massachusetts rule states, the courts relied on the doctrine of relation back to determine whether the trustee in bankruptcy could avoid security interests perfected just prior to bankruptcy. See Thompson v. Fairbanks, 196 U.S. 516, 25 S.Ct. 306, 49 L.Ed. 577. This suggests that the real basis for decision in these cases was not that state law provided no protection against secret liens but that even though creditors without knowledge could obtain a priority over the unperfected security interest by attaching the property prior

---

4. The Bank's security interest in the accounts receivable was fully perfected when it attached, and it attached when the Bank had rights in the collateral, which was when the accounts receivable came into existence. See Sections 9–303(1), 9–204(1) and 9–204(2) (d) of the Commercial Code.

5. See Kripke, "The Code and the Bankruptcy Act," 42 N.Y.U.L.Rev. 284, 289 (1967); Hogan, "Games Lawyers Play with the Bankruptcy Preference Challenge to Accounts and Inventory Financing," 53 Cornell L.Rev. 553, 557 (1968);

Friedman, "The Bankruptcy Preference Challenge to After-Acquired Property Clauses Under the Code," 108 U.Pa.L. Rev. 194, 218 (1959); cf. Rosenberg v. Rudnick, 262 F.Supp. 635, 638 (D.Mass. 1967); William Iselin & Co. v. Burgess & Leigh Ltd., 52 Misc.2d 821, 276 N.Y.S. 2d 659 (Sup.Ct.1967).

Under other presently immaterial provisions of the Code, the Bank's security interest would be subordinate to the rights of buyers in the ordinary course of business and persons holding perfected purchase money security interests. See §§ 9–307(1) and 9–312(3).

to perfection, as a matter of federal law the trustee was not in the position of a prior attaching lien creditor. See, *e. g.*, Sexton v. Kessler & Co., 225 U.S. 90, 97, 32 S.Ct. 657, 56 L.Ed. 995. The trustee's rights were said to attach as of the filing of the petition, and the doctrine of relation back was relied on for the proposition that as to one not standing in the position of an attaching lien creditor, the operative event was the creation of rights between the parties which took place before the 4-month period. See Bailey v. Baker Ice Mach. Co., 239 U.S. 268, 275–276, 36 S.Ct. 50, 60 L.Ed. 275. The Act was not interpreted to specify the moment of perfection as the point at which a transfer took place.

That this was the problem Congress intended to remedy is supported by the fact that the revision of Section 60 in 1938 did not take the form of withdrawal of the reference to state law or the super-imposition of federal standards as to recordation or perfection. Instead the revisers merely delayed the effectiveness of a transfer to the point at which it became effective against bona fide purchasers [6] and creditors under state law and placed the trustee in the position to exercise the rights of those parties under state law as to transfers taking place within the 4-month pre-filing period. See H.R.Rep. No. 1409, 75th Cong., 1st Sess. 30 (1937). There is nothing in the legislative history which suggests that Congress intended to cast doubt on the method of financing by means of a rotating stock of accounts receivable. Indeed, the 1950 legislative repeal of

Corn Exchange Nat'l Bank & Trust Co. v. Klauder, 318 U.S. 434, 63 S.Ct. 679, 84 L.Ed. 884, suggests that Congress was aware of the importance of accounts receivable financing and approved its utility where the unsecured creditors of the bankrupt had record notice of the existence of such a financing agreement. In recommending the further amendment of Section 60 to restrict the bona fide purchaser test to real property transactions, the House Committee made the following observations:

"The present language of the act tends to impede and choke the flow of credit, principally to small-business men, and the object of the bill is to free its channels.

\*    \*    \*    \*    \*    \*

"In 1938 the Bankruptcy Act was amended to obviate the effect of these cases,[7] which were regarded with disfavor by the great majority. But, in so doing, the authors of the amendment went further than was necessary, and it brought about results which they did not anticipate. The amendment placed the trustee in the position of an artificial potential bona fide purchaser, and, by so doing, unintentionally invalidated many types of liens acquired in good faith and for value, in normal and accepted business and financial relationships." (2 U.S. Code Cong. Serv., 81st Cong., 2d Sess. pp. 1985, 1986–1987 (1950).)

Our upholding of the practice followed here by the Bank against attack as a preference does not depend on any re-

---

**6.** The operative language of amended Section 60a provided that " \* \* \* [a] transfer shall be deemed to have been made at the time when it became so far perfected that no bona-fide purchaser from the debtor and no creditor could thereafter have acquired any rights in the property so transferred superior to the rights of the transferee therein \* \* \*." (52 Stat. 869.) The reference to bona fide purchasers as well as creditors may have resulted from an excess of caution induced by the opinion in Carey v. Donohue, 240 U.S. 430, 36 S.Ct. 386, 60 L.Ed. 726, involving real

property. As recognized in the bifurcated test adopted in 1950 in the second sentence of 60a(2) (11 U.S.C. § 96(a) (2)), the reference to bona fide purchasers should have been, and now is, confined to real estate transactions.

**7.** Sexton v. Kessler & Co., 225 U.S. 90, 32 S.Ct. 657, 56 L.Ed. 995; Bailey v. Baker Ice Mach. Co., 239 U.S. 268, 36 S.Ct. 50, 60 L.Ed. 275; Carey v. Donohue, 240 U.S. 430, 36 S.Ct. 386, 60 L.Ed. 726; and Martin v. Commercial National Bank, 245 U.S. 513, 38 S.Ct. 176, 62 L.Ed. 441.

lation back of actions taken on the eve of bankruptcy in order to save a theretofore defeasible security interest from attack by the trustee. Rather, it relies on the relation forward of record notice prior to the 4-month pre-bankruptcy period as being sufficient to give the secured party a priority over subsequently attaching lien or judgment creditors, including the trustee. As the district court stated, these were "assets which the general creditors never reasonably expected and could not expect to have available to satisfy their claims." 286 F.Supp. at p. 604. To hold otherwise would result in "a windfall to the general creditor who had long been on constructive notice that the debtors' future assets were to be made a part of the secured creditor's collateral"! Friedman, note 5 *supra*, at p. 221. Accordingly, it does not distort the Congressional purpose to conclude that the "so far perfected" language of Section 60a(2) of the Bankruptcy Act was satisfied at the time of the September 1965 filing of the financing statements.

### The Transfer Was Not on Account of Antecedent Debt.

As an alternative holding, the district court reasoned that there was no voidable preference because there had been no transfer of Grain Merchants' property to the Bank "on account of an antecedent debt" within the meaning of Section 60a(1) of the Bankruptcy Act. The referee had reached the opposite conclusion by regarding the Bank's security interest in the accounts receivable as a separate interest in individual accounts. Under his reasoning, the transfers of this property of Grain Merchants to the Bank occurred at the moment the individual accounts receivable came into existence. Since the accounts receivable in question arose after September 20, 1966, the last date that the Bank extended credit to Grain Merchants, the referee held that those accounts receivable were transferred to secure antecedent debt of Grain Merchants to the Bank.

The district court considered the post September 20, 1966, accounts receivable as part of the entire stock of the accounts receivable transferred when the Bank filed its financing statements, stating that "From a business standpoint, the most accurate view of the transaction is to regard the stock of accounts receivable together as an entity which was given as security for a new loan" (286 F.Supp. at pp. 604–605). The entity theory was first advanced in Manchester National Bank v. Roche, 186 F.2d 827 (1st Cir. 1951), by Judge Magruder. As he stated (at p. 831):

> "By analogy it might be possible to treat a merchant's accounts receivable as a unit presently and continuously in existence, the component elements of which (the particular accounts) may be constantly changing, without affecting the identity of the *res*; so that a general assignment by way of security of accounts receivable present and future might be deemed to create *in praesenti* a lien upon this enduring unit, the accounts receivable, which lien would persist as a floating charge upon such *res*, however much its component elements might change from time to time by the payment of old accounts and the creation of new ones." [8]

As has been observed elsewhere, "this is a simple, common-sense approach that has long been accepted, though not in name, by decisions and statutes." Henson, " 'Proceeds' Under the Uniform Commercial Code," 65 Colum.L.Rev. 232, 235–236 (1965). The concept has been depicted as a stream:

> "The secured creditor's interest is in the stream of accounts flowing through the debtor's business, not in any specific accounts. As with the Heraclitean river, although the ac-

8. Because of the language of Section 5 of the New Hampshire Factor's Lien Act. Judge Magruder was unable to apply the entity concept in the *Manchester National Bank* case.

counts in the stream constantly change, we can say it is the same stream." (Footnote omitted.) Hogan, note 5 *supra*, at p. 560.

The entity theory is consistent with the approach to revolving loans adopted in Section 9–204(3) of the Code permitting a security agreement to provide that collateral, whenever acquired, secure the obligations covered by the agreement. Under this approach, "Advances and collateral interact as a single organism," thus negating antecedent debt. Kohn, "Preferential Transfers on the Eve of the Bankruptcy Amendments," 2 Prospectus 259, 267 (1968).

■ We agree with the decisions below and in In the Matter of Portland Newspaper Publishing Co., Inc., 271 F. Supp. 395 (D.Ore.1967), pending on appeal, that the creditor's security interest was in the entity of the accounts receivable as a whole, and not in the individual components, so that the transfer of property occurred here when the interest in the accounts receivable as an entity was created and the financing statements were duly filed in September 1965.[9] This recognizes business realities, for the business community has depended upon a revolving or flow type of accounts receivable financing for many years. As stated in the *Portland Newspaper* case, "Good business practice should be good business law" (271 F. Supp. at p. 400).

■ Accepting the entity theory here as to accounts receivable does not conflict with Section 60 of the Bankruptcy Act. Its purpose is to protect general creditors against those seeking unfair advantages during the four months before bankruptcy. The Bank is seeking merely to enforce a 1965 security agreement and not to press for any unfair advantage that occurred within four months of bankruptcy. As the court stated in

Rosenberg v. Rudnick, 262 F.Supp. 635, 639 (D.Mass.1967), about a comparable after-acquired inventory problem:

"The statutory provisions for notice filing were fully complied with. No supplier who sold merchandise on credit to Boyle can justifiably claim he relied on the appearance of Boyle's inventory. He could easily have determined the extent of Rudnick's interest in it, and could have protected himself, if he so wished, either by perfecting a purchase money security interest under § 9–312(3), or, as some suppliers did, by getting Rudnick to guarantee payment."

As pointed out in the *amicus* brief of the National Commercial Finance Conference, many lenders making loans secured by a revolving pool of collateral have dispensed with the assignment of individual receivables and the use of special cash collateral accounts for receiving and disbursing the proceeds therefrom. This flexible method of financing, with its minimum cost, is authorized by Section 9–205 of the Code, which abrogates the state law "debtor dominion" rule of Benedict v. Ratner, 268 U.S. 353, 45 S.Ct. 566, 69 L.Ed. 991, and would be jeopardized if financing institutions had to insist on individual assignment of after-arising accounts receivable. The trustee conceded at oral argument that if these somewhat archaic pre-Code procedures had been followed, with a new loan advanced for each account receivable, no attack under the preference Section of the Bankruptcy Act would have been possible. An objection of this nature which can be satisfied by the mere multiplication of unnecessary paper work which in itself contributes nothing to the protection of unsecured creditors does not persuade us that the method of accounts receivable financing employed here conflicts with anything in the Bankruptcy Act.

---

9. After-acquired inventory subjected to a security interest has also been viewed as a single entity rather than a mere conglomeration of individual items each subject to a separate lien. Rosenberg v.

Rudnick, 262 F.Supp. 635 (D.Mass. 1967); see Matthews v. James Talcott, Inc., 345 F.2d 374, 380 (7th Cir. 1965), certiorari denied, 382 U.S. 837, 86 S.Ct. 84, 15 L.Ed.2d 79.

In holding that the post September 20, 1966, accounts receivable were part of an entity, it follows that they were transferred when the financing statements were filed in September 1965. Since the transfer preceded the extensions of credit with which we are concerned here, such transfer could not have been made "for or on account of antecedent debt" under Section 60a(1) of the Bankruptcy Act.

### The Substitution of Collateral Doctrine Negates Any Preference Here.

■ Under the Bankruptcy Act, it is well settled that a transfer by an insolvent debtor within four months of bankruptcy is not a "preference" where the transfer to the creditor is "for a substantially contemporary advance." Dean v. Davis, 242 U.S. 438, 443, 37 S.Ct. 130, 61 L.Ed. 419. If such a transfer does not deplete the estate, it is not made "on account of an antecedent debt," nor does it have the effect of enabling the creditor "to obtain a greater percentage of his debt than some other creditor of the same class" (Section 60a (1) of the Bankruptcy Act, 11 U.S.C. § 96(a) (1). See 3 Collier on Bankruptcy ¶ 60.20 (14th ed. 1968).

Under the leading case of In re Pusey, Maynes, Breish Co., 122 F.2d 606 (3d Cir. 1941), through the substitution of collateral doctrine, a transfer of accounts receivable to the secured creditor made during the four months prior to bankruptcy is not considered preferential where the accounts transferred are substituted for prior released accounts. See In the Matter of Portland Newspaper Publishing Co., Inc., 271 F.Supp. 395, 401 (D.Ore.1967).

■ Here, as existing accounts receivable were collected by Grain Merchants and deposited to its accounts at the Bank, the funds from previously collected accounts were made available to the debtor, enabling it to continue in business and obtain new accounts receivable. During the critical period from September 20 when the Bank last extended value until September 30 when Grain Merchants ceased doing business, the debtor's withdrawals appear generally to have been in line with the deposits from new accounts receivable. See Appendix to this opinion. Our study of this record shows that at the end of each of the four months preceding bankruptcy, there was an excess of collateral over secured debt, indicating that collateral was regularly transferred in substitution for other collateral without diminishing the bankruptcy assets available for creditors. Here the newly arising accounts receivable may be considered as having been taken in exchange for the release of rights in earlier accounts and for a present consideration. Since the relative positions of the Bank and the debtor were unaltered by the exchanges, the debtor's other creditors cannot be considered harmed by the transactions with the Bank. See Hogan, note 5 supra, at pp. 561–565.

As previously observed under Section 9–205 of the Commercial Code, it was unnecessary for the Bank to assume dominion over individual accounts receivable. Therefore, it is no longer appropriate to apply strict timing or value rules [10] so long as at all relevant times the total pool of collateral, as here, exceeded the total debt. The trustee's purported distinction of In re Pusey, Maynes, Breish Co. on this ground is thus unpersuasive. In this connection, it is noteworthy that amendments to Section 60 of the Bankruptcy Act have been submitted by a committee of the National Bankruptcy Conference so that transfers of receivables, pursuant to a security agreement, within four months of bankruptcy will not constitute preferences if they arose in the

10. The timing rule is that the new collateral must be transferred to the secured party either prior to or contemporaneously with the release of the old collateral. The value rule is that if the new collateral is of greater value than the collateral which is released, a voidable preference to the extent of the difference in value will result.

ordinary course of the debtor's business. But under a proposed two-point test, there will be a preference to the extent that the aggregate value of the receivables subject to the security agreement on the date of filing the bankruptcy petition exceeds the aggregate value subject to the security agreement four months earlier. The preference is measured by reference to these two points of time regardless of the fluctuations of the collateral that might occur in the 4-month period. See Kohn, "Preferential Transfers on the Eve of the Bankruptcy Amendments," 2 Prospectus 259, 261 (1968). This two-point test does not require a detailed tracing of individual accounts receivable. Here the pool of accounts receivable was remarkably steady in aggregate value through the entire period of the security agreement (see Appendix), justifying the applicability of the substitution of collateral principle to these facts.[11] Hence for this additional reason we conclude that there was no forbidden preference.

The trustee strongly contends that the conclusion that the transfers of accounts receivable to the Bank were not on account of antecedent debt cannot be sustained without the aid of Section 9–108 of the Code.[12] He reasons that Section 9–108 must fall before the superior command of federal law as contained in Section 60a of the Bankruptcy Act.[13] We would be reluctant to hold that the Congressional reference to state law in Section 60a does not encompass the provisions of the Code, now adopted in 49 states and enacted by Congress for the District of Columbia and which has been recognized to be a valuable source for determining federal commercial law (United States v. Wegematic Corp., 360 F.2d 674, 676 (2d Cir. 1966); United States v. National Optical Stores, 407 F.2d 754 (7th Cir. 1969)). However, there is no need to resolve any asserted conflict, for Section 9–108 is unnecessary to the result reached here. That Section merely attempts to codify as state law the substitution of collateral doctrine, which is implicit in the provisions of the Bankruptcy Act, with the additional safeguard that such substitution arise in the ordinary course of business.[14]

The Permanent Editorial Board for the Uniform Commerical Code asserts that the accounts billed after September 20, 1966, were proceeds of inventory owned by Grain Merchants on that date, and in which the Bank therefore held a non-preferential security interest. From this, it is argued that the Bank's security interest in the proceeds of that collateral was also non-preferential. Since this point was not presented in the district court, it will not be considered here. See

11. The instant case involves none of the possible abuses foreseen by Professor Hogan, note 5 *supra*, at p. 561. No question of the secured creditor bettering his position during the 4-month period is presented here.

12. Section 9–108 provides:
"*When after-acquired collateral not security for antecedent debt.*—Where a secured party makes an advance, incurs an obligation, releases a perfected security interest, or otherwise gives new value which is to be secured in whole or in part by after-acquired property his security interest in the after-acquired collateral shall be deemed to be taken for new value and not as security for an antecedent debt if the debtor acquires his rights in such collateral either in the ordinary course of his business or under a contract of purchase made pursuant to the security agreement within a reasonable time after new value is given."

13. He thus aligns himself with proponents of what might well be called the "conspiracy theory" of the drafting of Section 9–108. See, e. g., Reimer, "Conflict Between Section 9–108 of the Uniform Commercial Code and Section 60(a) of the Bankruptcy Act," 70 Comm'l L.J. 63 (1965); Gordon, "The Security Interest in Inventory Under Article 9 of the Uniform Commercial Code and the Preference Problem," 62 Colum.L.Rev. 49 (1962).

14. Cf. Henson, "The Portland Case," 1 Ga.L.Rev. 257, 261–263 (1967).

Manchester National Bank v. Roche, 186 F.2d 827, 829, note 3 (1st Cir. 1951).

For the foregoing reasons. the judgment is affirmed.

APPENDIX

Grain Merchants' Deposits and the Balance
of its Accounts at Union Bank
at the End of Each Day Shown.

| Date in 1966 | Amount Deposited | Account Balance |
|---|---|---|
| September 20 | | $17,518.68 |
| 21 | $ 4,691.88 | 17,685.72 |
| 22 | 8,702.65 | 22,006.80 |
| 23 | 9,548.49 | 29,145.64 |
| 26 | 7,530.01 | 23,127.26 |
| 27 | 4,270.77 | 20,770.01 |
| 28 | 3,486.75 | 16,304.58 |
| 29 | 6,247.63 | 16,806.03 |
| 30 | 3,564.80 | 18,985.45 |
| | $48,042.98 | |

Total debt of Grain Merchants to Union Bank between January 1966 and September 1966, compared to accounts receivable of Grain Merchants.

| 1966 | Total Debt | Accounts Receivable |
|---|---|---|
| January | $162,000.00 | $176,483.21 |
| February | 162,000.00 | 191,439.52 |
| March | 162,000.00 | 177,343.26 |
| April | 160,000.00 | 183,021.65 |
| May | 160,000.00 | 172,192.84 |
| June | 156,850.00 | 172,816.20 |
| July | 155,000.00 | 169,629.81 |
| August | 150,000.00 | 185,292.43 |
| September | 150,000.00 | 176,841.77 |