**In the Matter of REMES GLASS, INC., Debtor.**

**HENDERSON GLASS, INC., and Henderson Glass Grand Rapids, Plaintiffs,**

v.

**REMES GLASS, INC., Defendant,**

v.

**James W. HOERNER, Trustee, Counter–Plaintiff.**

**Bankruptcy No. NG 89–02790.
Adv. No. 90–8234.**

United States Bankruptcy Court,
W.D. Michigan.

Jan. 14, 1992.

 

Plunkett & Cooney, P.C., John W. Callahan, Detroit, for plaintiffs.

Day, Sawdey, Flaggert, Thomas A. De Meester, Grand Rapids, for counter-plaintiff.

## OPINION AND JUDGMENT

DAVID E. NIMS, Jr., Bankruptcy Judge.

### PREFERENCES IMPROVEMENT OF POSITION AMENDMENTS

This is an action originally brought by Henderson Glass, Inc. (Henderson) and Henderson Glass Grand Rapids, Inc. (H.G.G.R.) against Remes Glass, Inc. (Debtor). As this adversary proceeding was filed during the Chapter 7 case, the Debtor never filed an answer. However, James W. Hoerner (Trustee), the duly appointed, qualified and acting trustee filed an answer and counterclaim. Involved is the respective rights of Henderson as secured creditor, H.G.G.R. as the purchaser of all of the assets of Debtor, and the Trustee in a bank money order, proceeds of the sale of the Debtor by the first lienholder Old Kent Bank and Trust Company (Old Kent), all funds in the Debtor's checking accounts, any tax and insurance funds, and the right to the corporate name of the Debtor.

### JURISDICTION

All parties concede that this adversary proceeding arises out of and is related to the Chapter 7 case of Debtor, the case is proceeding under 28 U.S.C. § 157(b)(2)(K) and (O), and that this court has jurisdiction.

### FACTS

For many years Remes carried on a retail and wholesale automobile parts business in the Grand Rapids area under the name of "Remes Auto Parts." Henderson had been carrying on a like business in the Detroit area. In 1988, Henderson became interested in expanding to the Grand Rapids area and in November of that year an agreement was entered into whereby Henderson would purchase the assets of Remes. However, investigation by Henderson revealed that Remes was hav-

ing problems. Operating capital was gone, there were payrolls to meet, and Internal Revenue back taxes were approaching $100,000. A possible loan was discussed and the sale was postponed.

Anson E. Moore, Jr. (Moore), who had been employed by Henderson since December of 1973, entered into the employment of Remes in December 1988 as its president. Around the same time Carlton P. Ostdiek, president of Henderson and Diversified Services, the parent company of Henderson, was made the chairman of the board of Remes. Bill Remes remained on the board of directors.

On January 20, 1989, Henderson loaned $200,000 to Remes. The Debtor executed and delivered to Henderson a promissory note and security agreement on all of the Debtor's intangibles. Moore and Ostdiek signed the said documents. All of the parties were aware of the fact that Old Kent had a previously perfected security interest in all assets of the Debtor.

■ In a proceeding in the Circuit Court for the County of Kent, State of Michigan, Case No. 89–62285–CK, captioned *Henderson Glass, Inc. v. Remes Glass, Inc. and Old Kent Bank and Trust Company*, a consent judgment was entered on July 11, 1989 in which the Honorable Donald A. Johnston made the following findings:

1. Remes is indebted to Henderson in the amount of $205,661.11 through July 7, 1989 plus interest at $77.78 per diem thereafter plus attorneys' fees and costs of $4,050.00.

2. Remes is additionally indebted to Henderson in the amount of $46,548.75 as of July 7, 1989 and interest shall accrue thereon at the statutory rate of interest on judgments.

3. Remes is indebted to Old Kent in the sum of $365,198.10, plus accrued and unpaid interest of $12,263.72 from June 13, 1989 to July 5, 1989, plus a *per diem* interest charge of $118.05.

4. Remes is liable to Old Kent for all of its attorneys' fees and costs incurred and to be incurred in connection with this matter, which attorneys' fees and costs amount to $6,381.48.

5. Old Kent holds valid, perfected, and first priority security interests and liens in essentially all of Remes' intangible and tangible property, to wit: all accounts, contract rights, chattel paper, general intangibles (including, without limitation, telephone numbers, business names and goodwill), inventory, documents of title evidencing inventory, machinery, equipment, furniture and fixtures (including, without limitation, signs), and the proceeds thereof (the "Collateral").

6. To secure all of the sums due and owing to it by Remes, Henderson holds valid, perfected, and second priority security interests and liens in the Collateral, which liens and interests also secure all of Henderson's foreclosure expenses, including reasonable attorneys' fees and costs.

Judgment was entered in favor of Henderson and against Remes, in the amount of $252,209.86, plus interest as set forth above, costs of $50 and attorneys' fees of $4,000.

This court finds that it is bound by the above findings of fact and judgment by virtue of the doctrines of *res judicata* and collateral estoppel.[1]

The court ordered the collateral to be sold at a private sale on or after 1:00 p.m. on July 29, 1989 at the office of Old Kent. A hearing was set for July 28, 1989 at 9:30

---

1. "Collateral estoppel" is an awkward phrase, but it stands for an extremely important principle in our adversary system of justice. It means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit. *Ashe v. Swenson,* 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970).

I would hold that the trustee is in privity to the Debtor. "... a judgment is binding on privies because they are identified in interest, by their mutual or successive relationship to the same rights of property which were involved in the original litigation" 46 Am.Jur.2d Judgments § 532 (1969).

a.m. at which any intervening creditor might be heard. If there were no objections, or if the court allowed the sale to proceed in spite of objections, then the proceeds of the sale were to be distributed first to Old Kent; second, after satisfaction of Old Kent, to Henderson; and third, any remaining surplus to Remes.

On the 28th at 9:30 a.m. in the Kent County Circuit Court, an objection was made to the sale, which was overruled. There was an indication that some creditors were considering the filing of an involuntary petition in bankruptcy. After returning from the hearing, Moore asked the bookkeeper of the Debtor to draw out all the money in the bank account and pay it to Old Kent. The bookkeeper wrote a check to Old Kent and received a bank money order made payable to Old Kent in the sum of $18,000. At 4:01 p.m. an involuntary petition for relief was filed against the Debtor. When the $18,000 was tendered to Old Kent, it was refused as Old Kent then had knowledge of the bankruptcy and the 11 U.S.C. § 362 automatic stay.

The Debtor had planned that Saturday, July 29, would be its last day of business. In the morning a few insurance cases were processed but retail trade was discouraged. The doors were closed at 1:00 p.m. and no operations took place nor were any bank deposits made by the Debtor thereafter. Moore resigned as president of the Debtor at 1:00 p.m. that day.

On Monday, July 31 after a hearing at which no objection was made, this court granted a motion by Old Kent for relief from stay and the original sale ordered by the state court took place. The assets of the Debtor were purchased by H.G.G.R. for $410,000.00 which was paid to Old Kent. Although originally it was planned that Diversified Services would take over the Grand Rapids operations, H.G.G.R. was newly incorporated for this purpose and Moore became president of the new corporation. In accordance with the order of the state court, Old Kent retained $392,068.05, which paid its secured claim in full, and paid the balance of $17,931.95 to Henderson. On August 1, 1989 Old Kent signed and delivered to H.G.G.R. a Bill of Sale which conveyed, pursuant to the consent judgment,

All accounts, contract rights, chattel paper, general intangibles (including, without limitation, telephone numbers, business names and goodwill), inventory, documents of title evidencing inventory, machinery, equipment, furniture and fixtures (including, without limitation, signs), and the proceeds thereof (the "Collateral").

The allocation by Buyer of the purchase price to the assets acquired is as follows:

1. Accounts $165,000.00;

2. Inventory and documents of title evidencing inventory at Store 1—Grand Rapids $138,219.70;

3. Inventory and documents of title evidencing inventory at Store 3—Jenison $3,176.88;

4. Machinery, furniture, fixtures, equipment, and signs at all locations but excluding three signs at Store 2—Lansing $83,600.42;

5. Contract rights $1.00;

6. Chattel paper $1.00;

7. General intangibles (including without limitation, all telephone numbers, business names and goodwill) $1.00;

8. All signs, billboards and the like at Store 2—Lansing $20,000.00.

The secretary and comptroller of Henderson testified that these figures were arbitrary and were only established for tax advantages. Thus goodwill, which was not tax deductible, was given no value. However, this is the only evidence of the value of inventory and accounts at the time of filing. Presumably the bank account was exhausted at the time the money order was purchased on July 28, but the bank account balance on July 31 was $14,378.58. I would assume that the balance was partially outstanding checks and partially the $3,600 picked up from Old Kent by the trustee. As this was an involuntary petition, the account would not have been closed until the order for relief was entered on September 8, 1989. No evidence was offered on the history of the account after

July 31. The testimony was that no deposits were made into the account after July 29. Everything that went into the account in July was from collection of accounts receivable or sales in the ordinary course of business except for the proceeds from an auction sale in early July of out-dated inventory equipment and office furniture. Proceeds of this sale were paid to Old Kent and the Debtor.

A small matter that took up an unusual amount of court time was a mistake due to H.G.G.R.'s office manager's use of an obsolete deposit slip for $1,507.92 on August 22, 1989. The slip was for an account at Michigan National Bank in the name of Remes Auto Parts, the original name for Remes Glass, Inc. The name had been changed after December 1988, and the forms should have then been destroyed. The trustee called the Michigan National Bank, but it stated that no such account existed. H.G.G.R.'s accounts had been opened at Manufacturers Bank. H.G.G.R.'s bookkeeper was not available to testify, nor was Kent Grove who also worked in the office at that time. It was even suggested that possibly the bookkeeper or Grove had obtained a reversal of the mistaken deposit. Although the trustee was willing to turn over the deposit if located, the court was not satisfied that the trustee or any bank was even in possession of the funds.

No evidence of any bank account other than that with Old Kent was offered. Existence of tax refunds or insurance refunds was also not established. The trustee investigated the possibility of such refunds but found to the contrary, that the Debtor owed taxes and an insurance bill.

## DISCUSSION

### 1. *BANK MONEY ORDER*

■ Originally, the issue seemed to be whether Henderson or the trustee was entitled to hold the $18,000 bank money order purchased by Remes and made payable to Old Kent. There is no question as to the intent of all parties which took part in the transaction. On July 28, 1989 the circuit court ordered the sale to be held after denying an objection thereto. Indications that an involuntary petition in bankruptcy might be filed against the Debtor had not yet materialized. Preparatory to the sale and takeover, Moore, still president of the Debtor but soon to be president of H.G.G.R., directed the Debtor's bookkeeper to draw out all of the monies in the account at Old Kent and purchase a bank money order made payable to Old Kent. This was done. Payment was tendered but refused because of the automatic stay. Old Kent bank knew that either the involuntary petition had been filed or was about to be filed. By July 31, Old Kent had been paid in full and the money order could no longer serve its original purpose.

In *Department of Treasury v. Bank of the Commonwealth*, 111 Mich.App. 553, 314 N.W.2d 688 (1981) a taxpayer who owed state employee withholding taxes purchased a cashier's check for $4,434 payable to the state. The state served a warrant-notice of levy on the bank. The taxpayer appeared at a branch of the bank, indorsed the check to herself and received full payment some five days after the warrant was served. The state sued the bank and its motion for summary judgment was granted. The court of appeals affirmed, stating:

A cashier's check is:

"A bank's own check; a check drawn upon a bank and signed by its cashier, or assistant cashier, being a direct obligation of the bank. Cashier's checks are issued to borrowers when loans are made in lieu of a deposit credit or actual cash, sold to customers for remittance purposes, and issued in payment of the bank's own obligations, money transfers, etc. When a cashier's check is issued it becomes a credit, and upon its return through the clearing house or otherwise, a debit to the cashier's account. Cancelled cashier's checks are presumed as vouchers in the bank's files." Garcia, Munn's Encyclopedia of Banking and Finance (7th ed. 1973).

The issuance of a cashier's check by a bank constitutes an acceptance of the check, generally said to extinguish the bank's right to countermand the check.

*State of Pennsylvania v. Curtiss National Bank of Miami Springs, Florida,* 427 F2d 395, 398–399 (CA 5, 1970), *National Newark & Essex Bank v. Giordano,* 111 NJ Super 347, 351, 268 A2d 327 (1970). The maker or acceptor of an instrument "engages that he will pay [it] according to its tenor at the time of his engagement * * * ". MCL 440.3413(1); MSA 19.3413(1).

Although the bank accepted the check by issuing it, that acceptance never became effective since it was never completed by delivery or notification. MCL 400.3410(1); MSA 19.3410(1). Brown never delivered (negotiated) the check to the state, MCL 440.1201(14); MSA 19.1201(14); MCL 440.3202(1); MSA 19.3202(1). Also, the bank's duties to the state as drawer of the check were not yet in effect because the state was not yet the holder, MCL 400.3413(2); MSA 19.3413(2). To be a holder, a party must be in possession of the instrument in question. MCL 440.1201(20); MSA 19.1201(20).

Because the bank's liability to the state had not yet become fixed, the check was still subject to cancellation by agreement between the bank and the purchaser. Even though a cashier's check may not be countermanded once issued and delivered, it may be cancelled by the purchaser prior to such delivery.

Pursuant to MCL 600.6017(2); MSA 27A.6017(2), execution may be had against a debtor's personal property including "bills and other evidences of debt". The cashier's check, prior to delivery, represented the bank's debt to Brown. See *Jensen v. Oceana Circuit Judge,* 194 Mich 405; 160 NW 620 (1916).

The levy was served upon the bank before Brown returned and cancelled the check prior to a delivery of it to the state. It represented personal property in her hands as a debt owed by the bank to her. The trial judge was correct in holding that the levy was valid and that the funds held by the bank as a result of the issuance of the cashier's check to Brown were subject to the state's levy.

*Department of Treasury v. Bank of the Commonwealth,* 111 Mich.App. at 556, 314 N.W.2d 688. The holding by the court of appeals is applicable to this case. Old Kent's liability to Old Kent never became fixed because Old Kent never became a holder of the check and thus the check only represented the bank's debt to Remes. The check is subject to the security interest of Henderson the same as any other account.

H.G.G.R. claims in its amended complaint that it purchased the money order as part of the assets listed in the bill of sale. As cited earlier, the bill of sale, tracking the language of the consent judgment, lists "All accounts, ... and the proceeds thereof (the "Collateral")." M.C.L.A. § 440.9106 states " "Account" means any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel paper whether or not it has been earned by performance." The money order does not fit into the definition of account. Whether it qualifies as "proceeds" is not clear from the document itself and therefore, the facts surrounding this transaction must be considered.

The money order was obtained at Moore's direction on Friday, July 28 in an attempt to pay down the debt owed to Old Kent in anticipation of a sale scheduled for Saturday, July 29. On that same day, Old Kent having refused to accept the money order due to an involuntary bankruptcy petition, Moore contacted counsel which advised him to turn the money order over to Henderson, as it was their money. On the following Monday, July 31, the money order was given by Moore to a representative of Henderson. The sale of the assets to H.G.G.R. closed on August 1. Moore was the president of the newly formed H.G.G.R. In the transcript of this proceeding, just a few pages after Moore's testimony of the above facts, he asserts that he understood the money order to be part of the assets purchased by H.G.G.R. The court holds that such an assertion is disingenuous, and the money order was never intended to be included in the bill of sale.

In addition, there is no rationale for including the money order in the sale. It would be the same as selling cash. The purpose of the sale by Old Kent was to try to pay off the secured creditors Old Kent and Henderson as they had first and second liens respectively on all the assets.

## 2. CHECKING ACCOUNT BALANCE

The trustee closed out the debtor's bank account which came to $3,751. It is probable that these funds represented outstanding checks at the time the money order was obtained which could not be cashed after the bank froze the account at the time of the bankruptcy. In the absence of proofs to the contrary it can be assumed that these funds came from the sale of inventory or collection of accounts receivable and will be addressed along with the money order in the following preferential transfer section.

H.G.G.R. also claims in its amended complaint that the sum in the checking account was also purchased under the terms of the bill of sale. For the same reasons discussed above as to why the money order was not a part of the sale, the court finds that the checking account was not part of the sale.

## 3. PREFERENTIAL TRANSFER

█ This case was confusing to counsel and the court because the real issue was not mentioned until the time of the trial. This issue is the problem of a possible preferential transfer because of the so called floating lien.

Henderson had a security interest in essentially all of the assets left in the hands of Remes at the time of filing. This security interest had been perfected. With Old Kent satisfied, Henderson should have had no problem except for the fact that its claim was extensively under collateralized. Where payments are made to an under collateralized secured creditor within the 90 day period prior to the filing of a bankruptcy petition,

The Court must assume, in the absence of proof to the contrary, that the payments were credited towards the unse-

cured portion of the debt, since this course of action would comport with standard business practice. Consequently, one must conclude that BancOhio received greater payment on its unsecured claim than other unsecured creditors and that the transaction satisfies the requirements of Section 547(b)(5).

*Spence v. Lansing Automakers Federal Credit Union (In re Satterla)*, 15 B.R. 166, 167 (Bankr.W.D.Mich.1981), citing *In re McCormick*, 5 B.R. 726 (Bkrtcy.N.D. Ohio 1980). *See also Barash v. Public Finance Corp.*, 658 F.2d 504 (7th Cir.1981). Henderson perfected its lien, but as for the after acquired accounts receivable, inventory, and proceeds, the security interest would not attach until the Debtor had rights in the collateral. If the Debtor's interest in collateral arose within the 90 day period, 11 U.S.C. § 547(b) would create certain rights in the trustee.

At the time the new bankruptcy code was being considered, the status of the law under § 60 of the Bankruptcy Act was in a state of flux. *See DuBay v. Williams*, 417 F.2d 1277 (9th Cir.1969) and *Grain Merchants of Indiana Inc. v. Union Bank and Savings Co.*, 408 F.2d 209 (7th Cir. 1969). The new 11 U.S.C. § 547 made several changes as to preferential transfers among which was the treatment of the floating lien. This change adopted the improvement in position test in § 547(c)(5). First § 547(e)(3) now defines a transfer as taking place after the debtor acquires rights in the property transferred. Section 547(c)(5) now provides:

(c) The trustee may not avoid under this section a transfer—

(5) that creates a perfected security interest in inventory or a receivable or the proceeds of either, except to the extent that the aggregate of all such transfers to the transferee caused a reduction, as of the date of the filing of the petition and to the prejudice of other creditors holding unsecured claims, of any amount by which the debt secured by such security interest exceeded the value of all security interests for such debt on the later of—

(A) (i) with respect to a transfer to which subsection (b)(4)(A) of this section applies, 90 days before the date of the filing of the petition;

...

A simple explanation of how the new test works is set forth in *Kaye, Preferences under the New Bankruptcy Code*, 54 Am. Bankr.L.J. 197 (1980), at p. 207:

It basically says that a creditor with a security interest in inventory [defined by § 547(a)(1) ], a receivable [defined by § 547(a)(2) ], or the proceeds of either, cannot reduce his unsecured deficiency during the 90 days (one year for an insider) before bankruptcy. Specifically, it provides that there is a preference only to the extent that inventory, receivables or their proceeds come under a perfected security interest during the prescribed period, and have the effect of reducing, at the time of bankruptcy, the dollar amount for which the secured party was unsecured 90 days (one year for an insider) prior to bankruptcy, if that reduction has been at the expense of unsecured creditors.

The test is easier to demonstrate than explain. One merely compares the unsecured portion on the two critical dates. In the facts set out below, assuming a creditor secured by present and future receivables, there is a preference of $2,000 dollars.

| 90 Days Prior to Bankruptcy | | At Bankruptcy |
|---|---|---|
| Outstanding loans | $20,000 | $30,000 |
| Receivables | 17,000 | 29,000 |
| Deficiency | 3,000 | 1,000 |

Preference = $3,000 − $1,000 = $2,000

Incidentally much was said at the trial and in the briefs about UCC § 9–306(4). Whereas here, we have a security interest in after acquired inventory and accounts receivable it does not seem that 9–306(4) serves a useful purpose. Kaye at p. 213 states:

The inevitable conclusion is that Code § 545 deals UCC § 9–306(4)(d) a lethal blow. Why courts that have considered UCC § 9–306(4) in a bankruptcy setting have not looked at Code § 545 (or its predecessor, Bankruptcy Act § 67c(1)(A))

remains a mystery. It would seem unlikely that Code § 545 will continue to be ignored.

When applying the formula of § 547(c)(5), at the date of the filing of the involuntary petition, Remes owed Henderson $256,259.86. The best evidence available to the court of the then value of the inventory and accounts receivables are the value given on the Bill of Sale executed by Old Kent at the time of the sale or shortly thereafter. The value of the accounts receivable was $165,000. The value of the inventory was $141,396.58. The prorated PSP value allotted to Henderson of the accounts receivable would be $7,216.52 and of the inventory would be $6,184.19.

The court carefully searched the record but could find no evidence as to the status of the debt, accounts receivable, inventory and proceeds as of April 29, 1989, the date 90 days prior to filing.

§ 547(g) provides:

For the purposes of this section, the trustee has the burden of proving the avoidability of a transfer under subsection (b) of this section, and the creditor or party in interest against whom recovery or avoidance is sought has the burden of proving the nonavoidability of a transfer under subsection (c) of this section.

Henderson has not proved its right to prevail under § 547(c).

## 4. *MOTION TO AMEND*

Federal Rule of Bankruptcy Procedure 7015 states that, "Rule 15 FR Civ P applies in adversary proceedings." F.R.Civ.P. 15(b) provides:

(b) Amendments to Conform to the Evidence. When issues not raised by the pleading are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. If evidence is

objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the party in maintaining the party's action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.

During the trial, Henderson objected to the trustee proceeding with proofs as to a preferential transfer under § 547 as this had not been pleaded by the trustee. The court allowed the proceedings to continue. It is now clear that this is a preferential transfer case. Reading the transcript, it appears that Henderson and the court were not aware of the problems involved. The improvement in position test in § 547(c)(5) which dealt with the floating lien problem is one of the more complicated concepts in bankruptcy law. Having read the only two cases I could find in which § 547(c)(5) was applied, I am convinced that the new test has not made the task of the courts and counsel any easier.

In *Roemelmeyer v. Walter E. Heller & Co., Southeast, Inc. (In re Lackow Brothers, Inc.),* 752 F.2d 1529 (11th Cir.1985) the court relied on the computer value periodically submitted by the debtor to the creditor. The court adopted a simple rule on values; in Chapter 7 cases liquidation value would be used, and in Chapter 11 cases a going concern value should be used, citing 4 Collier on Bankruptcy ¶ 547.41 at 129 (15th Ed.1984).

The only other cases I found involved the same proceeding. In *Smith v. Associates Commercial Corp. (In re Clark Pipe and Supply Co., Inc.),* 893 F.2d 693 (5th Cir. 1990), *reh'g en banc denied* 899 F.2d 11 (1990). On hearing on motion for en banc hearing in the first case the court treated it as a petition for a panel rehearing and that was granted. The court then reversed its position and affirmed in part and remanded. Rehearing of this decision was denied.

In our case there is sufficient evidence to establish value at the time of filing. There is no evidence of value at the date 90 days before the date of filing. As much testimony has been taken, for the sake of judicial economy, I will allow the amendment as requested. However, I will for the sake of fairness and justice grant a reopening of the trial for the limited purpose of establishing proofs on valuation in accordance with the provisions of § 547(c)(5).

■ Although this is a chapter 7 case, I hold that the valuation will be on a going concern basis. The sale had been arranged for a long time before it took place through no fault of Henderson or the trustee. It was always to be sold as a going concern and was so sold.

## 5. *DECLARATORY JUDGMENT*

■ Henderson has requested a declaratory judgment as its rights as to any future assets that might be found, such as tax or insurance refunds, bank accounts, etc. 28 U.S.C. § 2201 does provide that "... any court of the United States, upon the filing of an appropriate pleading, *may* declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." (emphasis added). This is a valuable and wise provision but it is not mandatory. In view of the time that elapsed since an order for relief was entered and the diligent marshalling of assets by the trustee, I do not find any reason for acting on undiscovered assets. If any assets would show up at this late date there could be complicated reasons as to the delay and that could raise issues needing research and full investigation. Therefore, I decline to enter a declaratory judgment at this time.

## 6. *THE ERRONEOUS DEPOSIT*

As mentioned in the statement of facts, much trial time was expended on an erroneous deposit after filing by the purchaser, H.G.G.R. The deposit allegedly was made in the Michigan National Bank. The trustee called the bank and was informed that Remes had no open account with the bank.

While this is hearsay evidence, the burden of proof was on Henderson and H.G.G.R., and they presented no proof. This claim is dismissed.

### 7. *RIGHT TO THE CORPORATE NAME OF DEBTOR*

At the sale set up by the state court, H.G.G.R. purchased, *inter alia,* all right to the corporate name of the Debtor. The court finds no reason why the trustee should not assign to H.G.G.R. this right and apparently no objection is set forth in the briefs.

From the above findings of fact and conclusion of law it is ordered as follows:

1. Trustee's motion to amend its pleadings to include a claim of preferential transfer is granted.

2. The bank money order of $18,000 is a part of the bank account and perfection is subject to the same problems as the bank account itself, covered by 11 U.S.C. § 547(c)(5).

3. Proofs as to values on the date of filing the petition for relief and the day 90 days prior thereto under 11 U.S.C. § 547(c)(5) are reopened. As this is a matter of accounting and values, the parties may be able to apply the improvement in position test under § 547. Parties should keep in mind that, as set forth above, values should be on a going concern basis and the burden of proof is on Henderson. If the parties cannot settle this matter, the court will be notified not later than 30 days from the date of this judgment and a new date will set for trial of this issue.

4. Motion for declaratory judgment is denied.

5. Claim for loss due to an alleged erroneous deposit in the account of Remes in the Michigan National Bank is denied.

6. No costs or interest are allowed to either party.

7. The trustee will assign the right to use the Debtor's name and will execute all necessary documents to effect such assignment as may be required under Michigan laws.

8. A copy of this order will served by mail upon Plunkett & Cooney (John W. Callahan, Esq.), and Day, Sawdey & Flaggert (Thomas A. De Meester, Esq.).