James CISSELL, Trustee, Plaintiff,

v.

The FIRST NATIONAL BANK OF
CINCINNATI, Defendant.

No. 7886.

United States District Court,
S. D. Ohio, W. D.

Sept. 2, 1976.

Robert R. Lavercombe, Cincinnati, Ohio, for plaintiff.

S. Arthur Spiegel, Cincinnati, Ohio, for defendant; William McD. Kite, Cincinnati, Ohio, of counsel.

## OPINION AND ORDER

DAVID S. PORTER, Chief Judge:

This case is before the Court on cross-motions for summary judgment and supporting memoranda (docs. 55, 58, 59, 60 and 61). After consideration, the Court concludes that the case cannot be fully adjudicated on the cross-motions, and a trial will be necessary. A hearing was held and, by examining the pleadings and the evidence before it and by interrogating counsel, the Court concluded it is practicable to ascertain what material facts exist without substantial con-

troversy, and what material facts are actually and in good faith controverted. Pursuant to Rule 56(d) Fed.R.Civ.P., the Court thereupon makes the following order, specifying the facts that appear without substantial controversy. The Court also sets forth its conclusions of law and directs that the facts specified be deemed established and the trial proceed accordingly on the issues specified.

This is an action by James Cissell, Trustee in bankruptcy for World Academy, Inc., bankrupt, and World Academy School for Foreign Study, Inc., bankrupt, against the First National Bank of Cincinnati (First National), defendant, alleging that certain payments made between March 13, 1970 and July 1, 1970, were preferential transfers as defined under Sections 60(a) and (b) of the Bankruptcy Act, 11 U.S.C. § 96. Voluntary petitions in bankruptcy for World Academy, Inc., and World Academy School for Foreign Study, Inc., were filed on July 6, 1970. The defendant Bank became a secured creditor of the bankrupts on November 14, 1969, at which time the aggregate indebtedness stood at $500,000. The property described in the financing statement as subject to a security interest was "all accounts receivable then owed and thereafter acquired by the debtor." The security interest of the Bank was allegedly perfected in accordance with the provisions of Ohio Revised Code § 1309.01 *et seq.*, by the filing of financing statements covering such collateral executed by the appropriate parties, with the Secretary of State and the Hamilton County Recorder.

World Academy was established in 1966, "ascended like a sky rocket, and fizzed into bankruptcy appropriately on the weekend of July 4, 1970." *Cissell v. American Home Assurance Co.*, No. 7899 (S.D.Ohio, 1975). World ran educational junkets to Europe for students and teachers, in which students could earn credits toward their domestic educational requirements. The cost to each student was approximately $1,000. Students were given application forms to be filled in, paid an application fee of $25.00, and then sent in their applications through their teachers, who went along free if a certain number of students were solicited. Travel and lodging were all arranged on a group basis.

Judge Hogan's opinion in *Cissell v. American Home Assurance Co., supra,* provides some interesting background to the present action.

By June of 1970, as has been mentioned, something in the neighborhood of 5,000 students had been signed up to participate in the Summer 1970 World Academy Travel Courses. That would indicate a gross intake of some $4,000,000. During the previous summer, a large Wisconsin combination, including such names as Northern Trust Company, Northwestern National Insurance Company, etc., invested some $2,000,000 in stock of this company. On the surface, then, everything did look lovely. However, the surface did not tell the story and, for one reason or another, World Academy was broke. Of course, a great deal of this money involved had been prepaid to airlines, etc., to carry out the summer program, but certainly far from all of it. At the very most, in the neighborhood of 2,000 may have left the country on the 1970 program and some 2– to 3,000 never left their homes. The company went bankrupt in early July of 1970 and, while this record is not clear, a substantial number of students in Europe at the time were cut short and returned home. Typical claimants testified in this case, i. e., claimants who, as ex-students or would-be students, had filed claims in the bankruptcy against World Academy. One left New York on June 28 on what was to be a 40-day study trip concentrating in Paris. By the 7th of July, the group, of which she was a part, was informed that World Academy had collapsed and they were placed on their own. For practical purposes, about the only thing that was done with that group that was supposed to have been done was that they were taken over and brought back after being over there a couple of weeks on their own. Another witness was supposed to have left on June 28th—the trip was

postponed until July 7th and on July 4th the student was informed that there would be no performance at all. Another, who had paid approximately $1,000, left on June 28th, was brought back about 4½ weeks early and was stranded on her own during the time over there. Another was the parent of a student who was supposed to leave on the 7th of July and, of course, never left. The record contains a reference of a planeload (at least 180) ready to 'take off from some California airport on July 2nd and meeting with a cancellation at that time.

\* \* \* \* \* \*

In any event there have been thousands of claims filed by students in the bankruptcy and the aggregate amount of the claims exceeds $2,300,000. . . .

\* \* \* \* \* \*

Later on, on the trustee's motion, the bankruptcy judge granted orders enjoining any and all creditors from filing or proceeding further in any litigation to establish claims against World Academy except by claim filed in the Bankruptcy Court in the Southern District of Ohio. The order was signed in November of 1970. . . .

The present controversy between the Bank, First National, and World's Trustee, is over three payments made to the Bank on March 13, 1970, April 13, 1970 and May 8, 1970, aggregating $510,054.18 (doc. 61, p. 5).

The Bank stipulates (doc. 34) that on November 14, 1969 it renewed an indebtedness owing it from World of $200,000, and, in addition, loaned $300,000 more for an aggregate indebtedness of $500,000. This amount was to be repaid on or before March 31, 1970 (doc. 34, p. 5).

The Bank took a security interest in "all accounts receivable then owned and thereafter acquired by the debtor." The Trustee characterizes the facts somewhat differently, alleging that, if there was a security interest on November 14, 1969, it was released by repayment of $500,000 of indebtedness on February 13, and a renewal on March 16 (characterized as a "new loan")

(doc. 40, p. 1). For reasons stated below, we need not delineate the particulars of the Trustee's theory regarding renewals and new loans.

The Bank alleges that on March 16, 1970, the maturity date was extended 30 days, if the company and its subsidiaries would pay, on account of the principal due, $100,000 in April and $200,000 in each of May and June, 1970 (doc. 34, p. 6). On March 31, the Bank and World "agreed" that all collections on "accounts receivable" would be deposited in a "collateral account" owned by the Bank (doc. 34, p. 7).

On the creation of the collateral account, $275,000 was transferred to it from the bankrupts' general account, of previous collections on "accounts receivable" [including student tuitions payable] (doc. 34, p. 7). During the period the collateral account was in existence, further deposits and collections were made totalling $823,124.00, according to the Bank, some $600,000 of which was collected on accounts receivable owed by corporations other than World and World Academy (doc. 34, p. 7). The Bank goes on to describe the operation of the accounts as follows: The company (World) would present a list of accounts payable of World and its subsidiaries to be paid. The Bank would transfer funds from the collateral account in the amount of the requested payments and deposit them in the general account of the company and its subsidiaries. World would then draw on these funds (doc. 34, p. 8). The payments to the Bank from the collateral account of the indebtedness "secured" on November 14, were handled in the same way. There was a transfer to the general account of the company and its subsidiaries. Then the Bank would receive a check drawing funds from the newly fattened general account. The payments complained of were made in this manner (doc. 34, p. 8). After the payments in issue were paid to the Bank, the balance in the collateral account was $60,531.60. This was redeposited in the general account. Thereafter the aggregate sum of $3,633,406.00, collections on "accounts receivable" were deposited in the general account of the company

and its subsidiaries prior to the date of bankruptcy (doc. 34, p. 8). The sum of $2,915,284.80 in accounts payable was paid. On the date of bankruptcy, the deposits in the general account equalled $268,924.16.

The Trustee alleges that the Bank, while it had reasonable cause to know of the bankrupt's insolvency, seized funds, including advanced payments of student tuitions, for prospective summer tours in order to secure for itself a preference (doc. 40, p. 5). The Trustee outlines (at doc. 40, pp. 5–8) the close and continuous supervision of the bankrupts' affairs by the Bank. The Trustee contends that sometime prior to April 1, 1970, the Bank's supervision changed the general account, a general debtor-creditor relationship into deposits for a special purpose. The Trustee argues that the account referred to by the Bank as "Proceeds of Accounts Receivable, World Academy, Inc., et al., Escrow for the First National Bank of Cincinnati," was also a special purpose account established "not in good faith and not in the ordinary course of business" (doc. 40, p. 17). The Trustee's characterization of the accounts is as follows: The Bank would take advance payments of student tuitions, built up in the "collateral account," and put them into the general account. Bank approval was required before any payments could be made from the general account (doc. 40, p. 17). That is, the Bank would accumulate funds in the collateral account and then release amounts to the general account and approve a check for payment to itself (doc. 40, p. 18).

The Trustee claims that this system was part of a scheme or device to pay the bankrupts' debts to the Bank, while the bankrupts were insolvent; that the deposits were not accepted in good faith or in the ordinary course of business; that the Bank accepted or required the deposits for the purpose of giving itself an advantage through its right of set-off (doc. 40, p. 19).

## I.

### STATUTE OF LIMITATIONS

■ The defendant in this case has raised a preliminary issue involving § 11e of the Bankruptcy Act, 11 U.S.C. § 29, which provides for a two-year statute of limitations for actions brought by trustees to set aside voidable preferences. *Herget v. Central National Bank & Trust Co.*, 324 U.S. 4, 65 S.Ct. 505, 89 L.Ed. 656 (1945). Defendant points to plaintiff's complaint as alleging that plaintiff is acting as Trustee of World Academy, Inc., and World Academy School for Foreign Study, Inc.; and that plaintiff did not allege in the complaint that he is filing his claim as Trustee for the Institute of Cultural Education, International School for Young Americans, Travel Rite International and WACO Construction Co. Defendant claims that $225,000 of the money deposited in the collateral account was owned by these other corporations. Defendant argues that because two years have passed since the appointment of the Trustee for these companies, any action to recover this money is barred by § 11e (doc. 34, p. 19). It is defendant's position that the Trustee may not amend the complaint at this time to add "additional parties plaintiff," particularly since plaintiff had records in his possession available for inspection, and could have determined the true facts for himself (doc. 60, p. 14).

Plaintiff asserts that defendant admitted in the pleadings that the sums in issue were paid to the defendant by World Academy, Inc., and World Academy School for Foreign Study, Inc. (doc. 2, p. 1, referring to the complaint, doc. 1 ¶ 3). It is plaintiff's position that defendant is now estopped to assert the statute of limitations.

The Court notes that defendant acknowledged in its pleadings that plaintiff is Trustee for all of the above companies (doc. 2, p. 2) and consequently will grant plaintiff leave to amend. *Moore's Manual* § 9.09[9] (1975). The amendment will "relate back" to the filing of the original complaint.

## II.

■ One of the issues of law raised by both parties is the question of whether the descriptive words in the financing statement, "accounts receivable now existing

and hereafter acquired," is effective to give the Bank a security interest in student tuitions payable. This involves a construction of Ohio Revised Code § 1309.39(A) (UCC 9–402) (Formal Requisites of Financing Statement) which requires that the financing statement indicate the types, or describe the items of collateral. Section 1309.39(A) must be read in conjunction with § 1309.08 (UCC–9–110), which provides that "any description of personal property . . is sufficient whether or not it is specific if it reasonably identifies what is described." Critical to the above question is whether student tuitions payable are "accounts" within the meaning of Ohio Revised Code § 1309.01(A)(10) or "contract rights" within the meaning of Ohio Revised Code § 1309.-01(A)(11). If the tuitions payable are "accounts" the financing statement contained a sufficient description of the collateral, and the Bank was secured in November, 1969, and will prevail over the Trustee. The perfection of a lien covering an account receivable to be subsequently acquired is deemed to be the date of transfer for purposes of determination of a preference even as to accounts receivable coming into existence within four months of bankruptcy. *Grain Merchants of Indiana, Inc. v. Union Bank and Savings Co.*, 408 F.2d 209 (7th Cir. 1969), *cert. denied sub nom. France v. Union Bank and Savings Co.*, 396 U.S. 827, 90 S.Ct. 75, 24 L.Ed.2d 78; *DuBay v. Williams*, 417 F.2d 1277 (9th Cir. 1969); *James Talcott, Inc. v. Associates Capital Co., Inc.*, 491 F.2d 879 (6th Cir. 1974).

■ First of all, we note that the 1972 version of the Uniform Commercial Code (UCC) has not been adopted in Ohio. In that version, the definition of "accounts" is a right to payment for goods sold or leased or for services rendered *whether or not earned.* UCC 9–106. One of the reasons for the underlined language, which was an addition not found in prior versions, was to avoid litigation over insufficient descriptions of collateral of the type we have in the present case. See, 3 Uniform Laws Annotated, Uniform Commercial Code, comment to §§ 9–106 (1976 Pocket Part); *Turgeon Const. Co. v. Elhatton Plumbing*

*and Heating Co.*, 110 R.I. 303, 292 A.2d 230 (1972). Ohio has not yet adopted the 1972 version of 9–106. Ohio Revised Code § 1309.01(A)(10)(11) (UCC 9–106) retains the distinction between accounts and contract rights that was present in the pre-1972 version of UCC 9–106. Section 1309.-01(A)(10) states that an account "means any right to payment *for goods* sold or leased or for services *rendered* which is not evidenced by an instrument or chattel paper." (Emphasis added.) Section 1309.01(A)(11) defines contract rights as "any right to payment under a contract *not yet earned* by performance and not evidenced by an instrument or chattel paper." (Emphasis added.) Under this (the 1962) version of the UCC, contract rights ripen into accounts only when they are earned. R. Henson, *Secured Transactions*, 88–92 (1973). *See, Turgeon Const. Co. v. Elhatton Plumbing and Heating Co., supra.* Accounts and contract rights are, therefore, under the 1962 version of the UCC, separate and distinct categories, each of which may be collateral in a secured transaction.

■ The method of operation of the bankrupt as to student tuitions involved the student's signing the application form agreeing to make full payment by March 1, 1970. The student also agreed that no cancellations would be accepted after that date and no refunds would be made for any reason other than as provided under "refunds" in the 1970 World Academy Catalog. The Catalog, at page 26, provides for a full refund after March 1 only if the student finds a qualified replacement (Exhibits 1 and 2 to affidavit of Mr. Kite—doc. 60). We conclude that this transaction is not an account since the total service of taking the student to Europe, etc., has not been rendered. The student tuitions are closer to contract rights in that they represent a right to payment under a contract for services not yet earned by performance. We do not think that World "earned" advance payments by "performance," turning contract rights into accounts, merely by making advance payments nonrefundable after March 1. As to amounts actually earned by per-

formance, however, the sums represent "accounts" within the meaning of Ohio Revised Code § 1309.01(A)(10).

Having determined that some amounts of the tuitions payable were "contract rights" within the meaning of Ohio Revised Code § 1309.01(A)(11), we must decide if there was an adequate description of collateral under Ohio Revised Code §§ 1309.39 (UCC 9–402) and 1309.08 (UCC 9–110). We start with the understanding that the system of notice filing under the UCC is designed to permit a credit searcher to determine from the financing statement *itself* whether certain types of goods *may* be encumbered. Ohio Revised Code § 1309.-08 (UCC 9–110) provides that the description of personal property is a sufficient description if it reasonably identifies what is described. If the description is sufficient, then the credit searcher must make inquiry as to the exact nature and extent of the collateral secured. However, collateral not listed is not encumbered. J. White and R. Summers, *Uniform Commercial Code* 843 (1972). The comment to § 1309.08 indicates that a description is sufficient if it makes possible the identification of the thing described, the statute being enacted to change the holdings of old pre-code cases that required a description of an exact and detailed nature, the so-called "serial number" test.

The description requirements of §§ 1309.08 (UCC 9–110) and 1309.39 (UCC 9–402) do not sanction a total omission of a description or a description so broad or inapplicable that the credit searcher can get no meaningful assistance from the financing statement. J. White and R. Summers, *Uniform Commercial Code* 843–44 (1972). According to White and Summers at page 843:

> If the secured party lists "accounts" on his financing statement and claims the debtor's contract rights in bankruptcy, he will be held unperfected as to the contract rights because the description on the financing statement does not include them.

> He [the credit searcher] should be permitted to conclude . . . [that] . . . collateral not listed is not encumbered.

We conclude that defendant's reliance on § 1309.08 is misplaced. That section requires that the description in the financing statement put the credit searcher on notice. Before the credit searcher can be required to inquire of World and the Bank as to their internal categorizations, or examine their records, he must be given some reason to believe from the financing statement, that this type of collateral is or may be encumbered.

Defendant further asserts that whether an account receivable is an "account" or a "contract right" has relevance only with reference to "the method of satisfaction of the filing requirements," and that since both accounts and contract rights are perfected by filing, no harm was done, citing *In re Laminated Veneers Co., Inc. (Commercial Trading Co. v. Bassin)*, 471 F.2d 1124 (2d Cir. 1973). We do not read that case as supportive of the broad proposition defendant advances. The "filing requirements" of § 1309.39 are not limited to the method and location of filing. One of the "filing requirements" is that the financing statement give third parties a description of the type of collateral, sufficient to put them on notice that the collateral *may* be encumbered.

Defendant's reliance on *Industrial Packaging Products Co. v. Ft. Pitt Packaging International, Inc.*, 399 Pa. 643, 161 A.2d 19 (1960), is also misplaced. That case merely stands for the proposition that "accounts" is sufficient to describe "contract rights" that have ripened into accounts by performance. Furthermore, *Grain Merchants of Indiana, Inc. v. Union Bank and Savings Co., supra*, is not in point. While it is true that, as that case holds, "accounts" or "accounts receivable" is a sufficient description for after-acquired accounts, or contract rights that have subsequently become accounts through performance, *In re Varney Wood Products*, 458 F.2d 435 (4th Cir. 1972), *Grain Merchants* does not stand for the notion that "accounts" is a sufficient description of "contract rights."

■ After careful consideration of this issue, we are persuaded that plaintiff's position is the correct one. The Bank was unsecured as to student tuition payments not yet earned by performance. As to payments that were earned by performance, whether partial or total, the Bank was secured, because the contract rights matured into accounts receivable. The parties will be expected to submit evidence as to the amounts of unsecured collateral at trial. The Court may appoint a special master to determine the exact amounts in issue.

### III

■ Because we have determined that the Bank was unsecured as to unearned student tuitions, we need not consider the defendant's arguments dealing with "floating liens." Nor is it necessary to consider whether the alleged preferential payments were "new loans" cancelling the lien securing the old loan, or "old renewals." The transfers were preferences under § 60(a) if they were (1) transfers made by the debtor of its property, (2) to a creditor, (3) for past, present, or future consideration, (4) of an insolvent debtor, (5) within four months of filing the petition in bankruptcy, (6) the transfer enabling the creditor to obtain a greater percentage of its debt than other general creditors. Whether they are voidable preferences under § 60(b) turns on the issue of the defendant Bank's claimed right of set-off.

The Bank claims that even if this Court should decide that they are unsecured, they have a right of set-off against money deposited in the World Academy account. The Bank's claimed set-off extends to the money on deposit in the general accounts transferred to the collateral account ($275,020.11) and the money on deposit in the general account at the time of the filing of the petition in bankruptcy (doc. 44, pp. 4–5). This would amount to $275,020.11 which the bank has already set off, and $268,924.16 against which the bank has reserved its right of set-off. The total exceeds the amount of the preference claimed by the Trustee.

■ We agree with the defendant that as a general rule a bank has a right of set-off where an insolvent depositor makes general deposits within four months of bankruptcy, if the deposits are accepted in good faith and in the ordinary course of business. ¶ 68.16 *Collier on Bankruptcy* (14th ed. 1975). This is so even though the depositor was insolvent and the bank had reason to know of this at the time the deposits were made. But this right of set-off is not available where the Bank accepts the deposit for the purpose of payment, or of giving itself a subsequent preference through its right of set-off, or for some other special purpose. In such circumstances, there may be a recoverable preference. ¶ 68.16 *Collier on Bankruptcy*.

> The usual general deposits made on an open checking account subject to withdrawal at will constitute the type of deposits which will more often be considered above suspicion. But if the deposits are not accepted in the ordinary course of business, or are procured, accepted, or "built-up" for the real purpose of permitting the bank to obtain a set-off, the deposits will be considered voidable preferential transfers and the right of set-off is lost. ¶ 68.16 *Collier*, at 924–25.

These principles were recognized in a leading case, *Citizens National Bank v. Lineberger*, 45 F.2d 522 (4th Cir. 1930), where after reviewing the case law on the subject, the Court said:

> An examination of the cases cited in the preceding paragraph will disclose the principles upon which the bank's right to a set-off has been denied. In every case it will be found that the deposits were made for the purpose and as a means of effecting payment to the bank, or that they were not deposits made in the ordinary course of business and subject to withdrawal by the depositor, as where the bankrupt has suspended business and the deposits were being made from collections under the supervision of a creditor's committee, or that there was some circumstance that stripped them of the characteristics of deposits made in [the]

ordinary course, as where the bank had instructed that checks drawn by the depositor should not be honored.

The Trustee and the Bank offer the following evidence on the issue of the claim that the Bank's course of conduct was in furtherance of a scheme to create a build-up, and secure the preference in issue. We must determine if there are genuine issues of material fact to be tried.

### Bank Control

Plaintiff's exhibit No. 6, attached to the Trustee's affidavit (doc. 59), is a memorandum from Mr. Rielag, a bank officer, to Mr. Liggett, the Bank President, indicating bank supervision over the collateral account and bank control over payments out of the accounts (exhibit 6, pp. 20, 21, 22). Exhibit 6 indicates that the Bank controlled future deposits from the collateral to the general account and required approval of daily checks indicating that withdrawal from the general account was not at the will of the bankrupts.

### Knowledge of Insolvency

Plaintiff offers the statement of Bank President Liggett at pp. 44 and 45 of the Merlyn V. Fish deposition (doc. 58, p. 10) to show that in March, the Bank knew that World Academy was insolvent. Fish testified in the deposition that Liggett had a conversation with Fish in which Liggett related substantially the following:—"I ought to pull the string on you right now, he said, I don't know why you expect us to work with you when you operate like this. You have been insolvent for months now and you expect us to be happy." Plaintiff also offers exhibit No. 7 to establish the Bank's knowledge of or reasonable cause to believe the debtor's insolvency in March of 1970. Exhibit 6 to the Cissell affidavit is also offered to show the close observation of debtor affairs by officers of the Bank.

The defendant denies that there was a scheme to "build up" a preference in favor of the Bank. Furthermore, the Bank denies that World Academy was insolvent during the period in question (doc. 60, p.

11). The defendant offers a description of "Deferred Revenues" by Mary Hall, CPA to World Academy, in Note 2 to Exhibit 3 to the affidavit of William McD. Kite, to dispute the Trustee's evidence of insolvency. Defendant also denies any knowledge on the part of the Bank officers and employees as to the debtor's insolvency (doc. 60, p. 12). The defendant has some points to make concerning the date of preparation of the documents in Exhibit 7 (see doc. 60, p. 12) and the documents in Exhibit 5. The Bank also specifically denies the alleged conversation between Fish and Liggett on which the Trustee relies.

 Clearly there are triable issues of fact on the following questions:

(1) the debtor's insolvency at the time of the alleged preferential transfers

(2) the Bank's knowledge of the debtor's insolvency

(3) the actual amounts not subject to the Bank's security interest

(4) and whether the Bank acted in good faith and in the ordinary course of business.