**EYDE CONSTRUCTION COMPANY, a Michigan Corporation, et al., Plaintiffs,**

v.

**PUBLIC DATA ASSOCIATES, Defendant.**

**Bankruptcy No. G79–492 CA5.**

United States District Court, W. D. Michigan, S. D.

Sept. 11, 1980.

Richard W. Kinkade, Lansing, Mich., for plaintiffs.

John F. Betz, Lansing, Mich., for Burroughs Corp.

Robert N. Rosenberg, Lansing, Mich., for Michigan Depart. of Soc. Service.

Lester N. Turner, Lansing, Mich., for defendant.

## OPINION

BENJAMIN F. GIBSON, District Judge.

Eyde Construction Company ("Edye") and other unsecured creditors of Public Data Associates, Inc. ("PDA") bring this appeal from an order dismissing their petition in bankruptcy to declare PDA a bankrupt. The Bankruptcy Judge held that appellant Eyde rested without demonstrating that a preferential transfer had occurred, and so failed to prove the one act of bankruptcy it had alleged. *See* former 11 U.S.C. § 21(a)(2). *In re Public Data Associates, Inc.*, HG 77–01010 B5 (W.D.Mich. May 31, 1977). In essence, the appeal raises the legal question whether a security agreement covering after–acquired accounts receivable also secured the creditor in contract rights as they matured during the four months before bankruptcy, under the version of U.C.C. § 9–106 effective in Michigan during 1976 and 1977. Former Mich. Comp.Laws § 440.9106 (1970), *amended effective Jan. 1, 1979* by 1978 Mich. Pub. Act No. 369, § 1.[1] The Court is of the opinion that the question must be answered in the affirmative, and that the order issued below must stand.[2]

The operative facts of this appeal are quite simple. On November 8, 1976, the American Bank and Trust Company ("the Bank") perfected a security agreement with PDA (the "1976 agreement") which covered all of PDA's "current and future accounts, as defined by the Michigan Uniform Commercial Code." On April 5, 1977, PDA and the Bank perfected a second security agreement (the "1977 agreement") covering all accounts then owned and thereafter acquired; all instruments, contract rights, chattel paper and general intangibles; all equipment; and all inventory, again as defined by the U.C.C. Exactly four months later, on August 5, 1977, Eyde petitioned to declare the involuntary bankruptcy of PDA,

1. Former Mich.Comp.Laws § 440.9106 (1970), along with many other sections of Article Nine, was recently amended by Michigan's adoption of the 1972 Revision of the Code. 1978 Mich. Pub. Acts No. 369 (eff. Jan. 1, 1979). However, transactions such as that at bar, which were entered into before the effective data of the amendatory act, continue to be controlled by the pre–amendment provisions of Article Nine. M.C.L.A. § 440.11102. All citations to the Michigan U.C.C. in this opinion, unless otherwise noted, are to the pre–amendment law.

2. Although appellant's brief was not filed within fifteen days after entry of appeal by the Clerk, contrary to Bankruptcy Rule 808, the Court can detect no consequent prejudice to the appellee and therefore denies its motion to dismiss the appeal. *In re Har–Dway House Statuary*, 76 F.R.D. 204 (E.D.Mo.1977), is not controlling. There, the appellant completely failed to press his claim; here, appellant has presented the Court with a serious challenge to the ruling below, which should not be dismissed without consideration on the merits.

alleging that the funds paid to the Bank after execution of the 1977 agreement constituted a "preferential transfer" as defined in section 60(a)(1) of the Bankruptcy Act of 1898, former 11 U.S.C. § 96(a)(1), *repealed effective Oct. 1, 1979*, Bankruptcy Reform Act of 1978, § 401, 11 U.S.C. prec. § 101.[3]

The "Additional Findings of Fact" entered by Bankruptcy Judge Howard detail the division of assets which induced Eyde's petition and appeal. As of April 5, 1977, the date of the 1977 agreement, PDA was indebted to the Bank for roughly $258,000. On that date, the Bank was secured in collateral, including accounts receivable, valued at approximately $56,000. After that date, and up to the filing of Eyde's petition four months later, PDA earned an additional $250,000 by performing its data processing contracts with the Michigan Department of Social Services, nearly all of which were paid over to the Bank. The Bank was thus repaid the entirety of its loans to PDA, while the petitioning creditors received nothing. Eyde "does not contest the bank's collection of the $56,000 of accounts and other assets in which it had a security interest before April 5, 1977:" rather, it disputes the disposition of the additional quarter–million dollars earned afterwards.

Six elements must be established for a preferential transfer to be found under old section 60(a): (1) transfer of the bankrupt's property; (2) to a creditor; (3) on account of an antecedent debt; (4) while the bankrupt was insolvent; (5) within four months of bankruptcy; and (6) so that the creditor obtained a greater percentage of his debt than another creditor of the same class. *In re Columbus Malleable, Inc.*, 459 F.2d 118, 120 (6th Cir. 1972); *Steel Structures, Inc. v. Star Manufacturing Co.*, 466 F.2d 207, 217 (6th Cir. 1972). In the Order of Dismissal entered below on May 31, 1977, Judge Howard held that all six elements

were presented by the 1977 agreement except the last:

> With regard to the accounts receivable, American Bank and Trust was secured since October of 1974, and were [sic] the only members of that class. All of the monies received by American Bank and Trust were received as accounts receivable. If the April 5, 1977 agreement had not been entered into, then American Bank and Trust would still have been able to collect all of the monies it received as accounts receivable. Thus, the overall effect of the April 5, 1977 security agreement did not diminish any fund from which other creditors could participate.
>
> In the case at bar, the net effect of American Bank and Trust's obtaining a security interest in contract rights did not enable the bank to obtain a greater percentage of its debt.

*Id.* at 3. Appellant does not challenge the factual determinations, implicit in the Bankruptcy Judge's Order, that the Bank was secured in after–acquired accounts receivable, was the only creditor so secured, and had been so since perfection of the 1976 agreement. Eyde denies, however, that the Bank is the only creditor of its class, because it was *unsecured* as to the $250,000 earned during the pre–petition period, and that the pertinent class for determining preference is therefore that of all *unsecured* creditors.

The appellant makes a highly technical argument which plays on the interface between since–amended provisions of Article Nine and the old Bankruptcy Act. Appellant reasons as follows: On April 5, 1977, the Bank admittedly was secured in PDA accounts receivable worth $56,000, but was owed $258,000. Some $200,000 of PDA's debt to it was therefore unsecured. PDA did own, however, $250,000 worth of "contract rights." On April 5, 1977, apparently

---

**3.** The Bankruptcy Reform Act of 1978 abolished the concept of "acts of bankruptcy," 11 U.S.C. § 303(h), and substantially reworked the requirements for finding a preferential transfer, 11 U.S.C. § 547(b), but it does not control cases pending or filed before its effective date, October 1, 1979; the present case must therefore be decided under the terms of the old law. Bankruptcy Reform Act of 1978, § 403; 11 U.S.C. prec. § 101. Citations to the repealed bankruptcy law are hereinafter signalled by "old section" or "former 11 U.S.C."

without equivalent contemporaneous consideration, the 1977 agreement secured the Bank in a wide–range of PDA assets–including contract rights–not covered by the 1976 agreement.[4] Until that date, a judicial lien creditor could have levied on the contract rights before they became accounts, thus precluding their maturation into accounts receivable in which the Bank was secured. After execution of the 1977 agreement, no judicial lien creditor could levy on the contract rights and so cut off the Bank's security in accounts receivable. Under the test of the old Bankruptcy Act, a transfer is deemed accomplished when a judicial lien creditor could no longer levy on the asset. Former 11 U.S.C. § 96(a)(2). Thus, Eyde argues, the Bank did not become secured in PDA accounts receivable until April 5, 1977, within four months of the bankruptcy petition; it was therefore merely one of numerous unsecured creditors, and consequently enjoyed a preferential transfer.

Although directed against Judge Howard's holding that the Bank was the only creditor in its class, the appellants' argument actually implicates several other elements of a preferential transfer under old Section 60(a). They insist that the Bank was not the only member of its class–creditors secured in accounts receivable–when the 1977 agreement was made because it was not then secured in those accounts receivable earned during the four months preceding the petition. It could become secured in those accounts only as they were earned during the next four months. Thus, although couched in somewhat different terms, the appellants argument is essentially that a creditor can not be secured in accounts receivable until performance which vests a right to payment has been tendered; that is, until they have "attached." Until then, they remain a differ-

ent if related form of collateral in which the creditor took no interest and could be overridden.

■ This position is not without textual support in the U.C.C. The version of § 9–106 effective in Michigan at all relevant times defined the two types of collateral as follows:

> "Account" means any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel paper. "Contract right" means any right to payment under a contract not yet earned by performance and not evidenced by an instrument or chattel paper.

Former M.C.L.A. § 440.9106. The Code elsewhere provides that a "security interest cannot attach until ... the debtor has rights in the collateral," M.C.L.A. § 440.-9204(1), and that "the debtor has no rights ... in an account until it comes into existence." M.C.L.A. § 440.9204(2)(d). "Contract rights" and "accounts receivable" were indisputably distinct forms of property, each of which could be collateral in a secured transaction; *Nevada Rock & Sand Co. v. United States*, 376 F.Supp. 161, 165 n. 4 (D.Nev.1974); *E. Turgeon Construction Co. v. Elhatton Plumbing & Heating Co.*, 110 R.I. 303, 292 A.2d 230, 233 (1972); a secured party could assert no interest in a debtor's contract rights if the security agreement and financing statement listed only "accounts" as collateral. J. White & R. Summers, Uniform Commercial Code 843 (1972).[5] It might thus appear that a creditor secured in after–acquired accounts receivable in fact has no security interest in them until they have been earned by the debtor's performance, and it is only then that the "transfer" from debtor to creditor occurs.

---

4. Both the 1976 and 1977 agreements provided that the operative terms were governed by the definitional provisions of the Michigan Uniform Commercial Code.

5. It has been established, however, that a creditor secured in "accounts" or "accounts receivable" is secured in contract rights that have

subsequently become accounts upon performance. *In re Varney Wood Products*, 458 F.2d 435 (4th Cir. 1972); *Walker Bank & Trust Co. v. Smith*, 88 Nev. 502, 501 P.2d 639 (1972); *Industrial Packaging Products Co. v. Ft. Pitt. Packaging Int'l, Inc.*, 399 Pa. 643, 161 A.2d 19 (1960).

The appellants challenge to the ruling below, based on the since abolished distinction between "contract rights" and "accounts receivable," has been consistently rejected by courts applying the old Bankruptcy Act in a series of opinions which "immunized security agreements collateralizing after–acquired property without new advances against attacks under Section 60." S. Riesenfeld, Creditors' Remedies & Debtors' Protection 630 (2nd ed. 1975). In the leading case of *DuBay v. Williams*, 417 F.2d 1277 (9th Cir. 1969) (Hufstedler, J.), extensively discussed by both parties, two promissory notes were secured by an otherwise valid and perfected agreement assigning the creditor and interest in all accounts receivable "now existing or hereafter arising." *Id.* at 1285. The creditor's priority was upheld over the trustee's claim that any interest "in accounts receivable which came into existence within four months before bankruptcy is voidable as a preference because the transfer of such an interest could not have occurred earlier than the date upon which the account arose." *Id.* at 1287. In rejecting the argument, the Ninth Circuit reasoned that a "transfer" as contemplated by Section 60(a)(2) of the old Bankruptcy Act is accomplished "with the act by which *priority* over later creditors is achieved and *not* with the event which *attaches* the security interest to a specific account." *Id.* (emphasis added.) Priority is achieved by filing the financing statement with the proper state bureau, and it is the date of filing which marks the time of transfer. "Because [the creditor] filed its financing statement long before the four-

month period anteceding bankruptcy, its security interest is immune from the trustee's preference challenge." *Id.* at 1288. *Accord, In re King–Porter Inc.*, 446 F.2d 722 (5th Cir. 1971); *In re Grain Merchants of Indiana, Inc.*, 408 F.2d 209 (7th Cir.) *cert. denied*, 396 U.S. 827, 90 S.Ct. 75, 24 L.Ed.2d 78 (1969); *James Talcott, Inc. v. Associates Capital Co.*, 491 F.2d 879 (6th Cir. 1974); *Cissell v. First National Bank of Cincinnati*, 471 F.Supp. 480 (S.D.Ohio 1976); *Owen v. McKesson & Robbins Drug Co.*, 349 F.Supp. 1327 (N.D.Fla.1972) *aff'd mem.*, 486 F.2d 1401 (5th Cir. 1973). *In re White*, 283 F.Supp. 208 (S.D.Ohio 1967); *Rosenberg v. Rudnick*, 262 F.Supp. 635 (D.Mass.1967). *See* 3 Collier on Bankruptcy ¶ 60.51, at 1050.17 n. 66a (14th ed. 1977) (cases and literature gathered and critiqued). In the case at bar, the Bank recorded the financing statement securing it in accounts receivable in 1976, some nine months before appellant filed its petition. The transfer of the security interest in after–acquired accounts receivable was thus accomplished before the 1977 agreement was made; the Bank was indeed secured in accounts receivable as of April 5, 1977; and, as the only secured creditor of PDA, could not have been preferred over another member of its class.[6]

■ Appellant further urges that the test for determining preferential transfer established by the Bankruptcy Act of 1978, 11 U.S.C. § 547(c)(5), should be retroactively imposed on the transaction at bar. Application of this so–called "improvement in posi-

---

**6.** Appellants point out that in *DuBay*, neither the bankrupt nor creditor "took any affirmative action to obtain for [the creditor] a favored position over other creditors of its class during the four months before bankruptcy." 417 F.2d at 1289. They attempt to distinguish that case and the one at bar on the grounds that here, "the bank took a new security interest in virtually all of the bankrupt's assets and unquestionably improved its position within four months of bankruptcy." Brief for Petitioners–Appellants, at 5. The 1977 agreement cannot so easily be thought to defeat the Bank's otherwise valid interest under the 1976 agreement. First, the Court here upholds the ruling below that the Bank was indeed the only "creditor of

its class." It therefore secured no advantage over another by means of the 1977 agreement. *See Keenan Pipe & Supply Co. v. Shields*, 241 F.2d 486, 490 (9th Cir. 1956), *favorably cited in Selby v. Ford Motor Co.*, 590 F.2d 642, 648 n. 14 (6th Cir. 1979); *In re Columbus Malleable, Inc.*, 459 F.2d 118 (6th Cir. 1972); *In re Windsor industries, Inc.*, 459 F.Supp. 270, 277–78 (N.D.Tex.1978). Second, the Bank received nothing by operation of the 1977 agreement that it had not already secured to itself under the 1976 agreement. The Bank would have been entitled to the post–April 5, 1977 accounts receivable even if the 1977 agreement had never been made.

tion" test, it argues, would clearly demonstrate that the Bank received a preference. The Court is unpersuaded that such retroactive effect is proper here. First, the Congress was cognizant of the change it was working in the law of preferential transfer. As both the Senate and House Judiciary Committees stated in their Reports, section 547(c)(5) legislatively "overrules such cases as *DuBay v. Williams* . . . and *Grain Merchants.*" S.Rep. No. 989, 95th Cong., 2d Sess. 88 (1978), *reprinted in* [1978] U.S.Code Cong. & Admin.News, pp. 5787, 5874; H.R. Rep. No. 595, 95th Cong., 1st Sess. 374 (1977), *reprinted in* [1978] U.S.Code Cong. & Admin.News, pp. 5963, 6330. Yet the Bankruptcy Act of 1978 explicitly provides that cases which arose before its effective date are to be decided under the very law it was prospectively repealing. See note 3, *supra.* Second, the Bankruptcy Reform Act of 1978 abolished the concept of "acts of bankruptcy." *Id.* Its new test for determining "preferential transfer" can not legitimately be employed to make a determination for which it was not intended. Third, appellant points to the Seventh Circuit's reference to the then–proposed bankruptcy amendments to reach its result in *Grain Merchants*, 408 F.2d at 217–18. The "improvement in position" test did not thereby become the law under the old Act. At most, the Seventh Circuit looked to it as an alternative basis for its ruling, in accord with *DuBay v. Williams*, that "transfer of the property occurred here when the interest in the accounts receivable as an entity was created and the financing statements were duly filed." 408 F.2d at 216. Moreover, the Seventh Circuit did not then know that Congress would later direct that the substantive law of the old and new Bankruptcy Acts be kept separate. Fourth, PDA and the Bank perfected the 1976 agreement under a then–existing rule of law so well– established that explicit Congressional action was required to change it. It would be

unfair to retroactively apply the amended preference test without specific Congressional warrant to do so. Under the law existing at the time, and controlling today, the "test [of preferential transfer] under the Act is the obtaining by a creditor, out of the bankrupt's property, 'of a greater percentage of his debt than some other creditor of the same class,' and not the benefit or injury to the creditor involved." 3 Collier on Bankruptcy ¶ 60.34, at 903 (14th ed. 1977) (footnote omitted).[7]

The order of the Bankruptcy Judge is AFFIRMED.

IT IS SO ORDERED.

---

7. On July 6, 1977, the Internal Revenue Service filed a tax lien against PDA in the amount of $26,466.93. Since the Bank received essentially all of PDA's assets, the transfer of accounts receivable operates to preclude any recovery of funds by the IRS. This effect does not constitute a preference for the Bank, however, because tax lien creditors and fully secured creditors (such as the Bank) are not members of the same class. Former 11 U.S.C. § 64(a).