UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

SUMMIT FINANCIAL RESOURCES, L.P.,

        Plaintiff - Appellant,

v.

KATHY'S GENERAL STORE, INC.,

        Defendant - Appellee.

No. 10-3130
(D.C. No. 2:08-CV-02145-CM)
(D. Kan.)

**ORDER AND JUDGMENT**[*]

Before **MURPHY**, **SEYMOUR**, and **HOLMES**, Circuit Judges.

Summit Financial Resources, L.P. ("Summit") appeals from the district court's

entry of judgment, entered after a bench trial, in favor of Kathy's General Store, Inc.

("Kathy's General Store") on Summit's claim that Kathy's General Store was liable to

Summit as an account debtor. Summit argues that such liability arose because Kathy's

General Store failed to remit payments to Summit on accounts that Summit had

purchased from Kathy's General Store's fuel supplier, Walthers Oil Co. and Walthers,

Inc. (collectively, "Walthers"). As the parties have framed it, the dispute centers on the

---

[*] This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Federal Rule of Appellate Procedure
32.1 and Tenth Circuit Rule 32.1.

meaning of the financing agreement between Summit and Walthers, and specifically, whether this agreement encompasses "pre-payment accounts." We conclude that the financing agreement does encompass such accounts and that Kathy's General Store is liable to Summit. We reverse the decision of the district court and remand with directions to enter judgment in favor of Summit.

**I**[1]

Kathy's General Store is a combination service station, convenience store, and clothing and gift shop in Holton, Kansas. Kathy's General Store purchased fuel from Walthers, a motor fuel distributor, from 1989 through the end of 2007. Around April or May 2007, Kathy's General Store began using Petroleum Card Services ("PCS") to pay Walthers for the fuel. Specifically, PCS would deposit all proceeds from credit card sales made at Kathy's General Store—e.g., from sales of clothing, gifts, jewelry, and cigarettes, as well as fuel—into Walthers's bank account. Given that the deposits covered more than payments for fuel, this system frequently resulted in a credit balance in favor of Kathy's General Store that was often carried over from month to month. Thus, under this arrangement, Kathy's General Store usually ended up pre-paying for the fuel it purchased from Walthers. Even prior to using PCS, Kathy's General Store had maintained a credit balance with Walthers for at least the five years prior to December 2007.

---

[1] This background section relies heavily on the detailed factual findings of the district court, as set out in its May 5, 2010 Memorandum and Order. Neither party challenges these facts on appeal; rather, they dispute the correctness of the district court's legal conclusions.

Around June 21, 2007, Walthers and Summit, a commercial lender, entered into two financing agreements. Pursuant to the agreements, Summit purchased at least some of Walthers's accounts receivables and started making advances to Walthers. Summit also took a security interest in all of Walthers's accounts receivables.

The financing agreements provided that an account had to meet specific criteria before Summit would purchase it. In the language of the agreements, accounts that qualified for purchase were deemed to be "Acceptable Accounts." Aplt. App. at 144 (Financing Agreement, dated June 21, 2007). Section 14 of the agreements detailed the criteria for Acceptable Accounts. The district court summarized the criteria as follows:

> (1) Walthers Oil must have the sole and unconditional good title to the account and (2) the account had to be a bona fide obligation of the account debtor for the amount identified by Walthers Oil and no payments, deductions, credits or other modifications could have been made to the account.

*Id.* at 107 (Mem. & Order, filed May 5, 2010). Notably, as relevant to this litigation, the second enumerated paragraph of the district court's description corresponds to the substance of subsection (b) of Section 14 of the financing agreements, which provides:

> The Account is a bona fide obligation of the Account Debtor for the amount identified on the records of [Walthers] and there have been no payments, deductions, credits, payment terms, or other modifications or reductions in the amount owing on such Account . . . .

*Id.* at 150.

At least once a week, and sometimes more frequently, Walthers would submit to Summit a list of accounts for Summit to purchase. Walthers included its Kathy's General

3

Store accounts on these lists of accounts.

On July 30, 2007, Kathy's General Store received a Notice of Assignment ("NOA") from Walthers. The NOA explained that the terms of the financing agreements "'require[d] that payments on accounts receivable be made to [Summit]' and directed Kathy's [General Store] 'to make payment of all accounts receivable and all other amounts owing to [Walthers] directly to [Summit],'" and provided an address for Kathy's General Store to send the payments to Summit. *Id.* at 108 (first alteration in original) (quoting *id.* at 163 (NOA, dated June 15, 2007)). Further, the NOA instructed that all questions should be addressed to Summit and provided a telephone number for this purpose. Finally, the NOA stated that "the instruction to direct payment to Summit as set forth in the NOA 'may be changed or terminated only by written notice signed by [Summit].'" *Id.* (quoting *id.* at 163).

Instead of following any of the instructions in the NOA or seeking legal advice concerning its obligations under the NOA, Kathy's General Store contacted Walthers. Walthers advised Kathy's General Store to disregard the NOA and to continue remitting payments to Walthers. Pursuant to Walthers's advice, Kathy's General Store ignored the NOA and did not pay any money to Summit. Walthers also did not pay any money to Summit; indeed the district court found that it was "100% in default in submitting payments to Summit."[2] *Id.* at 109. In an attempt to receive the money it was due,

---

[2]     We note that the record reflects that in January 2008, Summit obtained a
(continued...)

4

Summit called Kathy's General Store in August and October 2007, but had to leave two messages requesting that someone from Kathy's General Store call Summit back. From the district court's findings of fact, it appears that Summit's messages were not returned. Summit finally reached someone at Kathy's General Store on December 18, 2007, and was advised that "Kathy's [General Store] never owed Walthers . . . money," and that, as of that date, it had a $25,768 credit balance with Walthers. *Id.* at 110. That same month, Kathy's General Store switched fuel suppliers and stopped purchasing fuel from Walthers.

Invoking the district court's diversity jurisdiction, 28 U.S.C. § 1332, Summit instituted this suit against Kathy's General Store in April 2008, alleging, *inter alia*, that Kathy's General Store owed Summit at least $582,077.85, in addition to pre- and post-judgment interest. In response, Kathy's General Store asserted a counterclaim for conversion. After a bench trial, the district court entered judgment for Kathy's General Store on Summit's claims and for Summit on Kathy's General Store's counterclaim. Only Summit appealed.

---

[2](...continued)
preliminary injunction against Walthers and subsequently received a total of $63,715.70. It is unclear from the district court's findings of fact and the parties' briefing, however, what relationship this money has to the amount owed to Summit from Kathy's General Store's accounts compared to the amount owed to Summit on the other accounts it purchased from Walthers. We leave it to the district court in the first instance to determine what relationship, if any, this $63,715.70 has to the amount that Kathy's General Store owes to Summit and that Summit seeks in this litigation.

5

## II

Summit raises only one issue on appeal: whether the district court erred in finding that Kathy's General Store was not liable to Summit because Kathy's General Store's accounts were "pre-paid" and thus were not "accounts receivable" under the statutory definition.

When a party appeals from a bench trial, "we review the district court's factual findings for clear error and its legal conclusions de novo." *Roberts v. Printup*, 595 F.3d 1181, 1186 (10th Cir. 2010) (quoting *Lippoldt v. Cole*, 468 F.3d 1204, 1211 (10th Cir. 2006)) (internal quotation marks omitted). We review "mixed questions of law and fact . . . 'under the clearly erroneous or de novo standard, depending on whether the mixed question involves primarily a factual inquiry or the consideration of legal principles.'" *Id.* (quoting *Estate of Holl v. Comm'r*, 54 F.3d 648, 650 (10th Cir. 1995)). Under diversity jurisdiction, our task "is not to reach [our] own judgment regarding the substance of the [state] law, but simply to ascertain and apply the state law." *Id.* (quoting *Wade v. EMCASCO Ins. Co.*, 483 F.3d 657, 665 (10th Cir. 2007)) (internal quotation marks omitted). Under Kansas law, which governs here, when a statute is plain and unambiguous, we "give effect to the intention of the legislature as expressed rather than determine what the law should or should not be." *Johnston v. Tony's Pizza Serv.*, 658 P.2d 1047, 1049 (Kan. 1983); *see Maxl Sales Co. v. Critiques, Inc.*, 796 F.2d 1293, 1296–97 (10th Cir. 1986) (relying on *Johnston*, and giving effect to the legislature's intention as expressed, with respect to a plain and unambiguous section of the Kansas

6

Uniform Commercial Code).

## III

Because of the way the district court resolved this case, and the way the parties have framed it before us, we navigate this case as follows. First, we set out the district court's legal conclusions, the parties' arguments, and the important concessions or acknowledgments made by Kathy's General Store. Next, we review Kathy's General Store's central argument—that a single section of the financing agreements, Section 14, should control this case. Finally, we conclude that even focusing on this (arguably inapposite) section of the financing agreements, Kathy's General Store is still liable to Summit on the accounts—even though they were pre-payment accounts—that Kathy's General Store had with Walthers.

## A

The district court concluded, as a matter of law, that after Kathy's General Store received the NOA on July 30, 2007, it was "obligated to pay Summit the amounts due and owing on the accounts [that Kathy's General Store] had with Walthers." Aplt. App. at 112. However, the district court reasoned, "Kathy's [General Store] did not incur a monetary obligation to Walthers . . . for fuel that had been or was to be delivered because Kathy's [General Store] prepaid Walthers . . . for the fuel." *Id.* And, because Walthers could not assign an interest it did not have, the Kathy's General Store's accounts that Walthers submitted to Summit were not actually accounts receivable, and Kathy's General Store therefore was not liable to Summit on those accounts. In so finding, the

7

district court relied on *Cissell v. First National Bank* (*Cissell II*), 476 F. Supp. 474 (S.D.

Ohio 1979), and its interpretation of the pre-1972 Uniform Commercial Code ("UCC").[3]

Summit argues that the district court's determination was based on an incorrect

reading of Article 9 of the UCC, as adopted by Kansas and codified at Kan. Stat. Ann.

§§ 84-9-101 to -801 ("Kansas UCC"). Specifically, Summit points out that Kansas has

adopted the 1972 version of the UCC and thus the pre-1972 version, as well as case law

interpreting it (such as *Cissell II*), is not applicable.

Notably, at oral argument, Kathy's General Store acknowledged that Summit was

correct that the pre-1972 version was inapplicable.[4] Specifically, it agreed with the

---

[3]     Prior to 1972, the UCC distinguished between "accounts" and "contract rights" based upon the time the right to payment accrued in relation to the time the services were rendered. As relevant for our purposes, "account" was defined to mean "any right to payment for goods sold or leased or for services *rendered*" and "contract rights" was defined as "any right to payment under a contract *not yet earned* by performance." *Cissell v. First Nat'l Bank* (*Cissell I*), 471 F. Supp. 480, 485 (S.D. Ohio 1976) (quoting Ohio Revised Code § 1309.01(A)(10)–(11)) (internal quotation marks omitted); *see id.* (noting that the "Ohio Revised Code . . . retains the distinction between accounts and contract rights that was present in the pre-1972 version of [Article 9 of the] UCC"). The 1972 version, however, broadened the definition of "accounts" to include "a right to payment for goods sold or leased or for services rendered *whether or not earned*." *Id.* Indeed, "[o]ne of the reasons for the [italicized] language, which was an addition not found in prior versions, was to avoid litigation over insufficient descriptions of collateral." *Id.*; *see also E. Turgeon Constr. Co. v. Elhatton Plumbing & Heating Co.*, 292 A.2d 230, 233 n.3 (R.I. 1972) ("The final report of the permanent editorial board for the Uniform Commercial Code filed on April 25, 1971, recommends that the term 'contract right' be eliminated as being unnecessary. One of the reasons for the recommended change has been the litigation that has been engendered because of inadequate descriptions contained in financing statements.").

[4]     We take this acknowledgment to be an implicit recognition that the district court's analysis was in error because it should not have relied on case law interpreting an

(continued...)

interpretation of the Kansas UCC that Summit has urged with respect to "how assignments and pre-payments can qualify" "generally" as accounts under the Kansas UCC, but argued that the Kansas UCC's definitions "d[id] [not] apply in this case by definition [and] by the terms of the financing agreement[s]." Oral Arg. at 16:39–17:08. At bottom, Kathy's General Store has accepted the premise that payment obligations arising from pre-payment arrangements are not categorically excluded from "accounts" under the Kansas UCC. However, it reasons that it should still be successful by relying on the terms of the financing agreements, especially Section 14.

**B**

Even were we to accept Kathy's General Store's premise that we should look to the financing agreements—and, more specifically, Section 14—to determine whether it had any obligations to Summit, Kathy's General Store's arguments would be unsuccessful. Read as a whole, the financing agreements show that—even considering Section 14—Kathy's General Store was obligated to pay Summit the pre-payment accounts that Kathy's General Store had with Walthers.

As noted, Section 14 of the financing agreements sets out several requirements that must be satisfied in order for an account to be considered a so-called "Acceptable Accounts"—in other words, accounts that qualified for purchase by Summit under the financing agreements. In pertinent part, subsection (b) provides that, in order to be such a

---

[4](...continued)
outdated version of the UCC.

9

qualifying account, it must be "a bona fide obligation of the Account Debtor" for the amount specified on Walthers's records and there must "have been *no payments*, deductions, credits, payment terms, or other modifications or reductions in the amount owing" on the account. Aplt. App. at 150 (emphasis added).

Kathy's General Store relies on the "no payments" aspect of this language in framing its argument that it had no obligation to pay Summit.[5] Specifically, it reasons that because Kathy's General Store made pre-payments to Walthers, its accounts cannot be deemed bona fide obligations within the meaning of Section 14(b) because payments continued to be applied to those accounts.

We disagree. Lest our discussion here of the merits of Kathy's General Store's position be interpreted to the contrary, we note at the outset that we seriously question whether Kathy's General Store can predicate any claim to relief on Section 14. This provision defines in part the relationship between *Walthers and Summit* and specifically clarifies which of Walthers's accounts may form the basis for advances by Summit. In other words, it clarifies which accounts qualify as Acceptable Accounts under the financing agreements and, therefore, are subject to purchase by Summit at its discretion. *See* Aplt. App. at 147 ("The obligation of Summit to purchase accounts from [Walthers] is discretionary and Summit shall have no obligation to purchase any account from

---

[5]     At oral argument, Kathy's General Store made brief remarks that might be interpreted as folding within its argument the other language of this clause relating to debits, credits, etc. Even if that were true, it would not alter the outcome that we reach here.

[Walthers], notwithstanding anything to the contrary in this agreement." (all-capitals format omitted)). Section 14, however, does not purport to define the obligations of *Kathy's General Store to Summit*. Such obligations primarily were driven, at the threshold, by the financing agreements' definition of "account." *See id.* at 144 ("'Account Debtor' means any person or entity obligated for payment of an Account.").

Accordingly, the question of whether Walthers's accounts stemming from its business dealings with Kathy's General Store were of sufficiently high quality that Summit elected to purchase them and advance money to Walthers against them (i.e., the subject matter of Section 14), would seemingly have no connection to, or bearing upon, whether Kathy's General Store owed Summit money based upon those accounts (i.e., the subject matter of this lawsuit). In other words, whether Walthers's accounts were deemed Acceptable Accounts would seemingly be a matter of concern only to Summit and Walthers, not Kathy's General Store, even if the accounts stemmed from Walthers's relationship with Kathy's General Store.

Summit underscored a similar point during oral argument. Specifically, Summit contended that Kathy's General Store's reliance on Section 14(b) and, more specifically, its focus on whether its accounts held by Walthers qualified as bona fide obligations and thus Acceptable Accounts that were eligible for purchase by Summit, is misguided. Summit noted that two of the district court's findings are undisputed: first, the security interest that it obtained from Walthers related to "*all* of Walthers . . . collateral, that is, its accounts receivables"; and second, the NOA instructed Kathy's General Store to "'make

11

payment of *all accounts receivable and all other amounts owing* to Walthers . . . directly to [Summit].'" *Id.* at 120–21 (emphases added) (quoting *id.* at 163). In light of those findings, Summit reasoned as follows: it is irrelevant whether Kathy's General Store's pre-payment plan produced bona fide obligations that were Acceptable Accounts eligible for purchase by Summit under Section 14(b) because Kathy's General Store had a clear obligation to pay *all* accounts to Summit—whether eligible for purchase or not (i.e., whether Acceptable Accounts or not)—as well as all other amounts owing to Walthers. Summit's reasoning is not without persuasive force.

All that said, we nonetheless elect to address Kathy's General Store's argument on its own terms because, even assuming that Kathy's General Store could appropriately base an argument for relief on Section 14, its position that the language of the financing agreements relieved it from the obligation to pay Summit is untenable.

To begin, we note that the language of the financing agreements itself—through a cross-reference to the 1972 version of the UCC—generally covers accounts based upon a pre-payment plan such as that present here. Specifically, while the financing agreements do not define "accounts," they state that terms not defined therein, but that are defined in the UCC, "shall have the meanings set forth in the UCC." *Id.* at 144.[6] The Kansas UCC defines an "Account" as, *inter alia*, "a right to payment of a monetary obligation, *whether*

---

[6] We note that the financing agreements purport to define "Accounts" as "hav[ing] the meaning set forth in the definition of Collateral"; however, there is no definition of "Accounts" within the definition of "Collateral." Aplt. App. at 144–45.

12

*or not earned by performance . . .* for property that has been or is to be sold."  Kan. Stat.

Ann. § 84-9-102(a)(2) (emphasis added); *see Decision Point, Inc. v. Reece & Nichols*

*Realtors, Inc.*, 144 P.3d 706, 709 (Kan. 2006) (noting that the UCC defines "account"

"broadly" and setting forth the definition); *cf. Cissell I*, 471 F. Supp. at 485 (discussing

the difference between the definition of "account" in the pre- and post-1972 versions of

Article 9 of the UCC).[7]  And the pre-payment plan here created just such a right to

payment (through the PCS system) in Walthers for fuel that Walthers delivered to

Kathy's General Store, whether or not that fuel was delivered prior to the payment from

Kathy's General Store to Walthers.  *Cf. In re Delta-T Corp.*, 475 B.R. 495, 519 (Bankr.

E.D. Va. 2012) ("[A]n agreement to sell goods to another creates a right to payment for

the seller. . . . [T]he prior distinction between 'contract rights' and an 'account' has been

discarded from the Uniform Commercial Code, and 'contract rights' are now included

within the definition of an 'account.'" (citation omitted)); *In re Barkley*, 31 B.R. 924,

926–27 (Bankr. Mich. 1983) ("The UCC makes no distinction between payments

received at the time goods are sold or payments not received until . . . after the

transaction.  For courts to rule otherwise and create such a distinction would lead to

wholly arbitrary and inconsistent results.").  In other words, as Kathy's General Store

acknowledged at oral argument, "there was an agreement between Walthers and Kathy's

---

[7]    "Because the UCC is intended to be applied uniformly across the various states, courts routinely turn to decisions from other states when there is no case law on point within the relevant jurisdiction."  *Nat'l Envtl. Serv. Co. v. Ronan Eng'g Co.*, 256 F.3d 995, 1004 (10th Cir. 2001).

13

[General Store] that Walthers would receive the payments," Oral Arg. at 25:43–48, and these payments were made from the proceeds of the PCS transactions that Kathy's General Store had assigned to Walthers.

Accordingly, the language of the financing agreements did not preclude, as a categorical matter, the accounts generated by the pre-payment plan between Kathy's General Store and Walthers from being bona fide obligations within the meaning of Section 14. And they in fact constituted such obligations. Specifically, by virtue of the ongoing fuel-supplier relationship that Walthers had with Kathy's General Store, the "bona fide obligation" here was the obligation to pay for the fuel.

Kathy's General Store was obligated to pay Walthers the reconciliation amount for the fuel that Walthers delivered to it. *See generally Black's Law Dictionary* 1386–87 (9th ed. 2009) (defining "reconciliation" in accounting as "[a]n adjustment of accounts so that they agree, esp. by allowing for outstanding items"). As the district court found, Kathy's General Store and Walthers would compare spreadsheets once a month "to determine the balance of the account." Aplt. App. at 106. Thus, the amount that Kathy's General Store owed Walthers for the fuel it had delivered that month was reconciled with the credit card balance processed through PCS. The key product of this reconciliation process was a definite, concrete number that was attached to an obligation by Kathy's General Store to pay Walthers for each month's fuel deliveries. This was a bona fide obligation that Kathy's General Store owed to Walthers.

As such, accounts generated by this fuel supply pre-payment plan would have

14

satisfied at least part of the criteria to be eligible for purchase by Summit (i.e., Section 14 criteria)—*viz.*, they would have constituted bona fide obligations.  According to Kathy's General Store, however, the "no payments" language of subsection (b) would have prevented these accounts from fully satisfying the criteria.  However, in light of Kathy's General Store's acknowledgment that the 1972 UCC includes accounts generated by pre-payment plans within its definition of accounts, and the incorporation of this UCC definition by the financing agreements, Kathy's General Store's "no payment" objection clearly must fail if it is construed as a categorical objection to pre-payment accounts.

Arguably, Kathy's General Store makes a different (or additional) point: that the "no payment" language is designed to exclude from the universe of accounts eligible for purchase (i.e., the zone of Acceptable Accounts) accounts that are in some sense not crystallized and definite, in that they contemplate the application of further payments, and that supposedly the accounts here are of this type.  Assuming Kathy's General Store does advance this contention, it would fail as a factual matter.  At the end of each month, Kathy's General Store and Walthers determined the reconciliation amount that Kathy's General Store owed to Walthers.  This amount was a concrete, fixed figure that constituted a bona fide obligation of Kathy's General Store to Walthers; it was not a fluid figure subject to the application of further payments.  Accordingly, the "no payments" language would not come into play.

Thus, even addressing Kathy's General Store's argument on its own terms—i.e., looking to the language of the financing agreements, especially Section 14—it cannot

15

prevail. The accounts of Kathy's General Store held by Walthers were bona fide obligations that were eligible for purchase (and actually purchased) by Summit; thus, it was liable to Summit for the amounts that it originally owed Walthers on those accounts.

## IV

For the aforementioned reasons, we **REVERSE** the decision of the district court and **REMAND** with directions to vacate its judgment in favor of Kathy's General Store and enter judgment in favor of Summit.

Entered for the Court

JEROME A. HOLMES
Circuit Judge